# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TIMOTHY FRANKS, | : | Civil Action No. 02-2652 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| COUNTY OF LEHIGH, | : | |
| THOMAS LAZORIK, | : | |
| BRIAN KAHLER, TED KEHM, | : | |
| JANICE NISBET, JANE BAKER AND | : | |
| RICHARD O. KLOTZ, | : | |
| | : | |
| Defendants. | : | |

## ORDER

AND NOW, this _____ day of _____, 2003, upon consideration of Defendants' Motion for Summary Judgment and Memorandum in support thereof, and Plaintiff's Response thereto, it is hereby ORDERED AND DECREED that Defendants' Motion is GRANTED as to all counts and Plaintiff's Complaint is dismissed with prejudice.

BY THE COURT:

_____
Honorable Louis H. Pollak

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TIMOTHY FRANKS, | : | Civil Action No. 02-2652 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| COUNTY OF LEHIGH, | : | |
| THOMAS LAZORIK, | : | |
| BRIAN KAHLER, TED KEHM, | : | |
| JANICE NISBET, JANE BAKER AND | : | |
| RICHARD O. KLOTZ, | : | |
| | : | |
| Defendants. | : | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants County of Lehigh, Thomas Lazorik, Brian Kahler, Ted Kehm, Janice Nisbet,

Jane Baker and Richard O. Klotz (collectively "Defendants"), by and through their counsel,

move this Court pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary

judgment in favor of Defendants and against Plaintiff Timothy Franks ("Plaintiff"). In support

of their motion, Defendants aver as follows:

1.    Plaintiff filed a Complaint against Defendants on May 7, 2002. Plaintiff alleged

discrimination on the basis of disability and failure to accommodate in violation of the

Americans with Disabilities Act and the Pennsylvania Human Relations Act ("PHRA"), as well

as aiding and abetting under the PHRA.

2.    The parties have participated in seventeen (17) months of discovery, including the

deposition of Plaintiff and the production of numerous documents

975238v1

3.    Yet, Plaintiff has not produced evidence to support the claims against Defendants that they discriminated against him because of his alleged disability or failed to accommodate his alleged disability.

4.    Plaintiff's discrimination and accommodation claims fail as a matter of law because (1) Plaintiff repeatedly failed to meet the performance expectations of his supervisors; (2) Defendants provided Plaintiff with every accommodation that he requested; and (3) Plaintiff failed to produce any evidence to show that his negative evaluations, which led to his termination, were the result of discrimination.

5.    In support of this Motion for Summary Judgment, Defendants incorporate the attached Memorandum of Law.

WHEREFORE, Defendants County of Lehigh, Thomas Lazorik, Brian Kahler, Ted Kehm, Janice Nisbet, Jane Baker and Richard O. Klotz respectfully request that this Court enter judgment in their favor as a matter of law because there are no genuine issues of material fact remaining for trial.

Respectfully submitted,

Date: ___1 7 03___

_____
David J. MacMain
L. Kristen Blanchard
Montgomery, McCracken, Walker & Rhoads, LLP
123 South Broad Street
Philadelphia, PA 19109
(215) 772-1500

Attorneys for Defendants,
County of Lehigh, Thomas Lazorik, Brian Kahler,
Ted Kehm, Janice Nesbit, Jane Baker
and Richard O. Klotz

-3-

975238v1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TIMOTHY FRANKS, | : | Civil Action No. 02-2652 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| COUNTY OF LEHIGH, | : | |
| THOMAS LAZORIK, | : | |
| BRIAN KAHLER, TED KEHM, | : | |
| JANICE NISBET, JANE BAKER AND | : | |
| RICHARD O. KLOTZ, | : | |
| | : | |
| Defendants. | : | |

DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Plaintiff Timothy Franks ("Plaintiff") was employed by the County of Lehigh in 1997 as a Grants Administrator and then an Accountant I. After his termination in June, 2001, for unsatisfactory performance, Plaintiff initiated several baseless claims against Defendants County of Lehigh, Thomas Lazorik, Brian Kahler, Ted Kehm, Janice Nisbet, Jane Baker and Richard O. Klotz (collectively "Defendants") pursuant to the Americans with Disabilities Act ("ADA") for discrimination based upon his diabetes. Plaintiff also alleges violations of the Pennsylvania Human Rights Act ("PHRA") for disability discrimination and a failure to accommodate. He further asserts a meritless claim of aiding and abetting in violation of the PHRA against individual Defendants Thomas Lazorik, Brian Kahler, Ted Kehm, Janice Nisbet, Jane Baker and Richard O. Klotz ("Individual Defendants").

After 17 months of discovery, including 8 depositions and written discovery, Plaintiff cannot meet his prima facia burden to support his claim that adverse employment actions were

taken against him because of his diabetes or that Defendants failed to accommodate Plaintiff's diabetes. Similarly, he cannot meet his prima facia burden to support a claim that the Individual Defendants aided and abetted in any violations of the PHRA.

Discovery shows:

1.    Plaintiff repeatedly failed to meet the performance expectations of his supervisors;

2.    Defendants provided Plaintiff with every accommodation that he requested; and

3.    Plaintiff failed to produce any evidence to show that his negative evaluations, which led to his termination, were the result of discrimination.

Plaintiff's testimony in this matter has been confusing, inconsistent and, at times, unintelligible. Portions of it are quoted at length or cited to in this brief to illustrate these characteristics, as well as to show Plaintiff's utter inability to produce any nexus between his negative evaluations and his subjective belief that he was subject to disparate treatment. Plaintiff is, quite simply, a proud man who denies that he had any performance deficiencies and who believes that his supervisors were incompetent.[1]

Plaintiff has failed to produce sufficient evidence to create an issue of fact that would necessitate a trial on any of his claims. Accordingly, all Defendants are entitled to summary judgment as a matter of law on all counts.

---

[1] To further assist the Court in understanding Plaintiff's reasoning and demeanor, a videotape of Plaintiff's Step IV grievance hearing with Defendant Janice Nisbet is attached as Exhibit "M."

957857v1

## I.    STATEMENT OF FACTS[2]

### A.    Parties

#### 1.    Plaintiff Timothy Franks

Plaintiff Timothy Franks ("Plaintiff") graduated from Lafayette College in 1967 with a degree in economics. (N.T. Pl. at 10).  He obtained a Bachelor's of Business Administration and a Masters of Science in accounting from the University of Miami. (Id. at 10-11).

Plaintiff obtained his job as a Grants Administrator with the County through his friend, Jane Baker, who was County Executive at the time.  (Id. at 29).  Baker, without any knowledge of Plaintiff's qualifications or whether a job opening existed, instructed the Fiscal Department to hire Plaintiff. (N.T. Baker,[3] at 10, 11-12).  As a result of Plaintiff's performance deficiencies, he was reclassified to an Accountant I after his first year of employment.

Plaintiff was diagnosed with juvenile diabetes at age 15 and requires insulin to control his blood sugar level. (N.T. Pl.[4] at 13).  As a result of his diabetes, Plaintiff's blood sugar level can change rapidly. (Id. at 13-14).  When his level begins to drop, he can offset the drop by ingesting carbohydrates, such as orange juice or soda. (Id. at 14).  Failure to properly monitor and regulate his blood sugar could result in a life-threatening coma. (Id. at 13, 16).

Until 1999, Plaintiff injected himself two to five times per day with insulin to assist in regulating his diabetes. (Id. at 14).  Plaintiff determined his need for insulin by pricking a finger on one of his hands, drawing blood and testing his blood sugar. (Id. at 14-15).  Nevertheless,

---

[2] All facts alleged by Plaintiff are provided for purposes of this Brief in Support of Defendants' Motion for Summary Judgment only.  Defendants reserve the right to challenge any or all of the facts set forth herein if this case proceeds to trial.

[3] "N.T. Baker" refers to pages from the transcript of Defendant Jane Baker's deposition, taken on March 27, 2003, and attached hereto as Exhibit "E."

[4] "N.T. Pl." refers to pages from the transcript of Plaintiff Timothy Frank's deposition, taken on October 14, 2002, and attached hereto as Exhibit "A."

957857v1

Plaintiff is not always able to recognize the onset of a low blood sugar episode. (Id. at 13-14, 191; Ex H[5] at 0045).

In December, 1999, Plaintiff began using an insulin pump to administer insulin. (N.T. Pl. at 6, 78). If used properly, the pump assists in monitoring Plaintiff's blood sugar and administers insulin as needed. (A copy of Plaintiff's expert report is attached hereto as Exhibit "L.")

2.    County of Lehigh

The County of Lehigh ("County") is a governmental organization that employs approximately 2,000 individuals. (N.T. Baker at 10). It is comprised of various departments, including a Fiscal Department. The Fiscal Department is responsible for, inter alia, performing accounts payable work, tending to payroll and pension accounts, handling budget functions and obtaining grants and outside funding for the County. (N.T. Gr. Hg.[6] at 10; see copy of job description for Grants Administrator, attached hereto as Exhibit "K").

The County maintains Personnel Policies and Procedures. The Procedures contain an "Equal Employment Opportunity and Affirmative Action Policy," which prohibits discrimination on the basis of, inter alia, disability. (Ex. H at 0272). The County also maintains a "Grievances and Appeals" policy by which an employee may file a complaint about any aspect of his or her employment with the County. (Ex. H at 0248-0250, 0253-55). The policy contains a five-step grievance procedure that culminates in a hearing before the Personnel Board. (Id.)

The County also has an Employee Performance Evaluation Policy, which provides that "any employee receiving an overall rating of unsatisfactory for two (2) consecutive annual

---

[5] Hundreds of pages were produced by Defendants in the course of discovery in this matter. Rather than give each document a separate exhibit tab, the pages cited herein are grouped together in numerical order as Exhibit "H." The page numbers referenced in this brief refer to the "Lehigh" Bates label on each page, usually located in the lower right corner of the page.

[6] "N.T. Gr. Hg." refers to pages from the grievance hearing on Plaintiff's termination, held on October 26, 2001, and attached hereto as Exhibit "I."

-4-

957857v1

evaluations shall be dismissed by the appointing authority for unsatisfactory service." (Ex. H at

0256-57, § II.B). This portion of the County policies provided the basis upon which Plaintiff

was terminated by Defendant Director of Administration Richard Klotz. (N.T. Klotz[7] at 7; N.T.

Gr. Hg. at 124-25).

### 3.    Richard Klotz

Richard Klotz ("Klotz") has been the Director of Administration for the County since

May, 1999. (N.T. Klotz at 4). He is the "appointing authority" as well as the individual with the

authority to terminate employees such as Plaintiff. (Id. at 5). By virtue of his position as the

Director, he has the sole authority to terminate, and ultimately approved Plaintiff's termination in

accordance with the County's policies and procedures. (Id. at 7-8, 11, 55-56, 57; N.T. Gr. Hg. at

49, 99, 123).

### 4.    Thomas J. Lazorik

Thomas Lazorik was the Chief Fiscal Officer for the County at the time of Plaintiff's

employment and termination.[8] (N.T. Gr. Hg. at 8; N.T. Baker at 10-11). Lazorik has a

Bachelor's Degree in accounting. (N.T. Lazorik[9] at 27).

While serving as Chief Fiscal Officer, Lazorik supervised Defendant Brian Kahler. (N.T.

Gr. Hg. at 8, 11). Although Lazorik was involved with Plaintiff's annual evaluations, he was not

involved in day-to-day supervision of Plaintiff or in regular discussions with Plaintiff about

---

[7] "N.T. Klotz" refers to pages from the transcript of Defendant Richard Klotz's deposition, taken on February 14, 2003, and attached hereto as Exhibit "G."

[8] Lazorik suffers from multiple sclerosis, is taking multiple medications and is wheelchair-bound. (N.T. Lazorik at 5, 13, 22-23, 24-25, 62-64, 82-84). Because of the progression of his illness, he relinquished the position of Chief Fiscal Officer in or around 2001 and assumed the position of Supervisory Accountant. (Id. at 3, 13, 56).

[9] "N.T. Lazorik" refers to pages from the transcript of Defendant Thomas Lazorik's deposition, taken on March 27, 2003, and attached hereto as Exhibit "C."

Plaintiff's need to improve his work product. (N.T. Kehm[10] at 15-16; N.T. Gr. Hg. at 31).  He

also was not involved with the recommendation or decision to terminate Plaintiff.  (N.T. Lazorik

at 64, 70-71).[11]

        **5.**     **Brian Kahler**

Brian Kahler ("Kahler") is the Fiscal Officer for Defendant County of Lehigh.  (N.T.

Kahler[12] at 4).  He has been a supervisor in the Fiscal Department for 19 years.  (Id.; N.T. Gr.

Hg. at 26).  Kahler has a Bachelor's degree in accounting and a Master's degree in finance.

(N.T. Gr. Hg. at 26).

Kahler was Plaintiff's immediate and "main" supervisor, and was responsible for

supervising Plaintiff on a day-to-day basis, including reviewing his work  (N.T. Kahler at 38;

N.T. Klotz at 6; N.T. Kehm at 5, 7; N.T. Gr. Hg. at 8, 11, 31).  Kahler also was the individual

primarily responsible for reporting Plaintiff's performance deficiencies to Defendant Klotz, who

ultimately approved Plaintiff's termination.  (N.T. Gr. Hg. at 49).  Kahler does not have the

authority to terminate any employee.  (N.T. Kahler at 5; N.T. Gr. Hg. at 79, 99).

        **6.**     **Ted Kehm**

Ted Kehm ("Kehm") has been a Supervisor in the Fiscal Department since February,

1991.  (N.T. Kehm at 34).  Kehm has a Bachelor of Science in accounting and passed the

appropriate exam to be certified as a CPA.  (Id. at 4).

---

[10] "N.T. Kehm" refers to pages from the transcript of Defendant Ted Kehm's deposition, taken on February 14, 2003, and attached hereto as Exhibit "F."

[11] At or around the time of Plaintiff's termination in June, 2001, Lazorik was battling the progression of his multiple sclerosis, including undergoing surgery, and was not available to get involved with any aspect of the Fiscal Department, including Plaintiff's termination.  (N.T. Lazorik at 62-64, 71).

[12] "N.T. Kahler" refers to pages from the transcript of Defendant Brian Kahler's deposition, taken on February 14, 2003, and attached hereto as Exhibit "B."

Any supervisory role that Kehm played with regard to Plaintiff was secondary to Kahler and Lazorik, although Kehm participated in the decision to reclassify Plaintiff from a Grants Administrator to an Accountant I. (N.T. Klotz at 31; N.T. Kehm at 5, 7-8). Kehm also provided input for Plaintiff's performance evaluations. (N.T. Gr. Hg. at 14).

### 7.    Jane Baker

Jane Baker was the County Executive from approximately 1993 until November, 2000. (N.T. Baker at 4, 36). The County Executive is an elected position and is akin to a governor or president. (Id. at 5).

Baker generally did not get involved in hiring or terminating County employees. (Id. at 10). However, she instructed Defendants Lazorik and Kahler to hire Plaintiff, who was a childhood classmate and friend of Baker, regardless of the fact that she did not know whether there was an opening in the Fiscal Department and was not familiar with whether Plaintiff was qualified for a position in the Department. (Id. at 9-12). Baker testified that she ordered that Plaintiff be hired because she felt sorry for him because he was unemployed. (Id. at 17-18, 48).

### 8.    Janice Nisbet

Janice Nisbet ("Nisbet") was the Human Resources Director for the County from 1999 until August 13, 2001. (N.T. Nisbet[13] at 5, 23). Nisbet also served as the County's Risk Manager, which required that she be advised of all medical "incidents" that took place on County property. (Id. at 33-35; N.T. Kahler at 15).

Nisbet had no authority to hire or terminate employees, and the decision to terminate Plaintiff was made independent of the Human Resources Department. (N.T. Nisbet at 10, 17, 85-86). Nisbet did not oversee evaluations of employees in the Fiscal Department and is not

---

[13] "N.T. Nisbet" refers to pages from the transcript of Defendant Janice Nisbet's deposition, taken on March 31, 2003, and attached hereto as Exhibit "D."

familiar with the manner in which evaluations in other departments were conducted by the individual supervisors. (Id. at 11, 14). She was not involved at any level in Plaintiff's evaluations. (Id. at 17, 85-86). Nisbet became involved in Plaintiff's termination only after he was terminated, at Step IV of the County's process for Plaintiff's grievance. (Id. at 86). Nisbet also was involved in the County's efforts to accommodate Plaintiff's diabetes. (See discussion, infra, at pp. 16-20).

**B.    Plaintiff's Employment with Defendant County of Lehigh**

**1.    Grants Administrator – 1997-1998**

Plaintiff began working as Grants Administrator on February 3, 1997. (Ex. H at 0231; N.T. Plaintiff at 38; N.T. Baker at 11-12). In that position, Plaintiff was responsible for, inter alia, obtaining grants for the County, determining whether County Departments could utilize grant money once obtained, and preparing quarterly reports for departments that received grants, which reflected activity and expenditures by the departments. (N.T. Pl. at 38-39; Ex. K). He also was responsible for performing general ledger work, filing grant papers, and searching for external sources for grant opportunities for the County. (N.T. Gr. Hg. at 9; Ex. K). It was imperative that Plaintiff's work be accurate. (N.T. Gr. Hg. at 44).

In April, 1998, Plaintiff received his first evaluation.[14] (N.T. Pl. at 45; Ex. H at 0018-21). The evaluation rated nine categories, five of which were rated "unsatisfactory" for Plaintiff. (N.T. Pl. at 46; Ex. H. at 0018). The unsatisfactory ratings were given in the categories of (1) quality of work; (2) quantity of work; (3) work habits; (4) work attitude; and (5) overall work

---

[14] Each year, the evaluation process was initiated by Kahler. (N.T. Gr. Hg. at 13-14, 21-22). Kahler then discussed his evaluation with Defendant Ted Kehm, who also evaluated Plaintiff. (Id. at 14, 21-22). After they agreed upon an evaluation of Plaintiff, they presented the evaluation to Defendant Lazorik and discussed it with him. (Id. at 14, 21-22). Based upon their meeting, Kahler, Kehm and Lazorik would "come up with a final evaluation" to give to Plaintiff. (Id. at 15, 21-22).

performance. (N.T. Pl. at 46; Ex. H at 018). The evaluation also contained a note that read as

follows:

> Tim, as you can see, we have serious concerns relating to your performance as the
> Grants Administrator. Therefore, at this time, we will, effective April 27, 1998,
> be reclassifying you to the position of Accountant I within the fiscal office at your
> current rate of pay of $41,891 annually.

(N.T. Pl. at 47-48).

Plaintiff met with Kahler, Kehm and Lazorik to review his evaluation, and also was

provided with a letter explaining the specific performance deficiencies that he suffered. (N.T.

Gr. Hg. at 16-17; Ex. H at 0019-20). One of Plaintiff's problems was his inability to obtain

funding from outside sources, which was a key component of his job. (N.T. Gr. Hg. at 17; Ex. H

0019-20). Plaintiff also "display[ed a] lack of basic fund accounting knowledge," was not neat

or organized with his files, failed to timely process requests from other offices, and failed to

"maintain day-to-day focus of [his] position." (N.T. Gr. Hg. at 17; Ex. H at 0019-20). Kahler

based his evaluation of Plaintiff in part upon Plaintiff's performance as compared with other

employees in the office. (N.T. Gr. Hg. at 18).

Plaintiff disagreed with the substance of the evaluation because (1) the evaluation was

"their opinion;" (2) Plaintiff had been a CPA for 35 years; (3) Plaintiff never received an

unsatisfactory review from another employer; and (4) Plaintiff received an "almost perfect" score

on the math portion of his "college boards." (N.T. Pl. at 48-51).

The evaluation form contained a "comments" section on which Plaintiff could respond to

his evaluation. (Id. at 53; Ex. H at 0018). Plaintiff admits that he failed to write anything in that

section. (N.T. Pl. at 53). He further admits that although he thought his evaluation was the result of discrimination, he failed to complain to anyone about his suspicion.[15] (Id. at 54).

As a result of his evaluation, Plaintiff was reclassified to an Accountant I. (Id. at 59-60; N.T. Gr. Hg. at 19). Plaintiff's salary did not decrease as a result of the reclassification and, in fact, a new salary category was created specifically for Plaintiff such that his salary was higher than any other Accountant I in the Fiscal Department. (N.T. Pl. at 60-61). At the time of his evaluation and reclassification, Plaintiff was instructed that it was "imperative" that, as an Accountant I, he focus on improving the following skills: (1) neatness and organization of files; (2) use of PC technology; (3) increase knowledge of basic fiscal office accounting operations; and (4) improve communication skills. (Ex. H at 0021).

### 2.    Plaintiff's employment as an Accountant I

#### a.    1998-1999

The job description for Accountant I is detailed and includes, inter alia, the following requirements: (1) knowledge of accounting methods, techniques and requirements commonly used in governmental financial systems; (2) ability to prepare statistical, accounting and financial statements; and (3) ability to establish and maintain effective working relationships with associates, officials in operating offices, and others involved in accounting and budget work. (Ex. H at 0503-0504). The job description also described the following as typical examples of work: (1) reconciling accounts; (2) analyzing budget submissions for conformance to instructions and completeness of information; (3) working with and assisting the submitting official to insure clarity and completeness of submission; (4) compiling and entering budget data

---

[15] Plaintiff later testified that he complained to County Administrator Ken Mohr that his 1998 evaluation was the product of discrimination. When pressed as to whether he actually complained about "discrimination," Plaintiff admitted that he "might not have." (N.T. Pl. at 63-64).

in the computer system; (5) preparing reports for internal use and submission to other County and/or Court offices, and State and Federal agencies; and (6) insuring completeness and accuracy of work. (Id.)

Plaintiff continued to exhibit performance deficiencies. (N.T. Gr. Hg. at 19, 20). Kahler discussed Plaintiff's continued performance problems with Plaintiff on at least a quarterly basis, after quarterly reports were filed by the office.[16] (N.T. Gr. Hg. at 20). Kahler saw some improvement in certain aspects of Plaintiff's work performance, however, he continued to believe that Plaintiff failed to perform at a satisfactory level on some "very core issues." (N.T. Gr. Hg. at 20, 26).

In March, 1999, Plaintiff received his annual evaluation for his performance as an Accountant I. (Ex. H at 0015-17). Plaintiff received an overall rating of "satisfactory." (Id.; N.T. Pl. at 65). Nevertheless, Plaintiff was rated as unsatisfactory in the categories of: (1) work is neat and presentable; and (2) observes established work hours. (Ex. H at 0016).

As was the case with his previous evaluation, Lazorik, Kahler and Kehm met with Plaintiff to discuss his evaluation. (N.T. Pl. at 66-67). In advance of his evaluation meeting with Plaintiff, Lazorik sent Plaintiff an email in which he posed two questions to Plaintiff: (1) "What is it that we are doing that is keeping you from being better?" and (2) "What is it that we are not doing that is keeping you from being better?" (Id. at 73-74; Ex. H at 0017). In response to the questions, Plaintiff listed five points. (Id.) Nowhere in any of the five points did Plaintiff cite discrimination or disparate treatment on any basis, or request an accommodation for his diabetes. (Id.) Instead, Plaintiff wrote that his evaluations could be more "positive." (Id.) Plaintiff admits that he purposefully refused to complain about discrimination. (N.T. Pl. at 75-76).

---

[16] Plaintiff denies that any performance deficiencies were discussed with him at any time other than his annual evaluations, although he admits that he was presented with errors in his work. (N.T. Gr. Hg. at 130-31, 136-37).

Q. Why didn't you mention your belief that discrimination was a factor when you responded to these two questions?

A. My past experience, the best way to do certain things is not to really strike the nail on the head that I was being [sic] discriminated. I was trying to go to the end results of what they were doing in the sense of evaluation. I didn't want to bring up my diabetes to them directly because they knew of my diabetes . . . I didn't bring up the discrimination because it wouldn't have helped me, especially to these three people.

(Id. at 76).

Plaintiff believed that the decision to reclassify him from a Grants Administrator position to Accountant I was a poor decision and he was embarrassed by it. (Id. at 69-70). He also believed that his 1999 evaluation was not a proper reflection of his work. (Id. at 70). Nevertheless, he admits that he failed to complain to anyone about alleged discrimination or even the accuracy of his performance evaluation. (Id. 70-71).

b.    1999-2000

In May, 2000, Plaintiff received his third annual evaluation. The evaluation stated that Plaintiff's overall rating was unsatisfactory and warned that Plaintiff would be re-evaluated in 90 days to determine if he had improved. (Ex. H at 0011-14). Plaintiff specifically was rated unsatisfactory in (1) quality of work; (2) work habits; and (3) overall work performance. (Id. at 0011). He also was given a rating of "needs to improve" in the category of "personal qualities."

As with prior evaluations, the 2000 evaluation listed specific concerns about Plaintiff's work performance. (Id. at 0011-14). The specific concerns were similar to those mentioned in Plaintiff's first year of employment, regarding quality of and neatness/legibility of work, failure to maintain proper documentation, failure to properly explain and report ongoing projects, failure to retain knowledge of County accounting system, inability to properly design spreadsheets, failure to complete grant documents, and incomplete disclosure to supervisors. (N.T. Gr. Hg. at 28-29). Several of these concerns reflected deficiencies in areas that had been deemed

-12-

957857v1

"imperative" areas of improvement on Plaintiff's first evaluation and that were listed on the job description for an Accountant I. (See discussion, supra, at p. 10).

One example of the errors that Plaintiff made was found in quarterly reports. Plaintiff failed to update the reports to reflect the actual reporting period, thus causing the reports to reflect data for a time period other than the correct one. (N.T. Gr. Hg. at 29). Kahler found that this happened on one or more grants every quarter. (N.T. Gr. Hg. at 30). Other Accountants I did not have similar problems with their work. (N.T. Gr. Hg. at 30, 31).

In addition to his evaluation, Plaintiff received an email containing the same questions posed the previous year, specifically, (1) What are we doing that is keeping you from being better?; and (2) What is it we are not doing that is keeping you from being better? (Ex. H at 0010). Plaintiff wrote, without elaboration, that he believed that his job performance review was not objective. (Id.)

The email also contained questions under the heading, "How are we [the supervisors] doing?" (Id.) In response to the questions, Plaintiff responded that (1) communication within the office was "fine;" (2) the supervisors were being "more positive in employee communication;" (3) the supervisors were available for questions; and (4) additional "stand-up meetings" were not necessary. (Id.) The only item to which Plaintiff responded negatively was whether the supervisors properly communicated "job duties and expectations." (Id.)

Despite his failure to say so at the time of his evaluation, Plaintiff testified that he disagreed with the evaluation. (N.T. Pl. at 87-88). When asked why he failed to tell anyone that he believed that he was being subject to discrimination, Plaintiff testified that,

> The situation did not entail [sic] me to help my position [sic], okay. They knew
> that my objectivity and my job performance – if I just said discrimination, I would
> have been gone quicker. That's what I felt. I just did not want to mention that
> part.

-13-

(Id. at 88).

Because of Plaintiff's unsatisfactory evaluation, Plaintiff was reevaluated in October, 2000. (Id. at 90; N.T. Gr. Hg. at 32-33; Ex. H at 0008-09). The evaluation showed improvement in certain, but not all, categories. (Ex. H at 0008-09). Specifically, Plaintiff continued to have problems with his knowledge of the system, disclosure and ongoing reports. (N.T. Gr. Hg. at 33). Defendants Kahler, Kehm and Lazorik met with Plaintiff to discuss his follow-up evaluation. (N.T. Gr. Hg. at 33-34). No other Accountant I required this type of 90-day follow-up evaluation. (N.T. Gr. Hg. at 34).

c.    2000-2001

Plaintiff's next annual evaluation took place in June, 2001. (N.T. Pl. at 118; N.T. Gr. Hg. at 34). The evaluation rated Plaintiff's performance as unsatisfactory because there were "core areas" in which he failed to improve. (N.T. Gr. Hg. at 35; Ex. H at 0003-04; N.T. Pl. at 118). Plaintiff received a rating of unsatisfactory in (1) quality of work; (2) work habits; and (3) overall work performance. (Ex. H at 0007). As with his evaluation in the prior year, the evaluation listed specific areas of performance deficiencies, including maintaining work papers, failure to retain knowledge of the accounting system, and disclosure of information, as well as continued problems with work habits and getting to work on time. (N.T. Gr. Hg. at 36).

The evaluation also informed Plaintiff that "the quality of your work product still requires significant supervisory oversight and correction." (Ex. H at 0004). The review stated that it would "be forwarded to the Director of Administration for further review." (Id. at 0004). Where

comments were invited, Plaintiff wrote that "this [evaluation] meeting was held and as I said during this meeting, I see no merit at all in this so-called evaluation."[17] (Id. at 0007).

Plaintiff also was given the series of questions that accompanied previous evaluations, seeking input as to the quality of his supervisors' performance. (Ex. H at 0005). As in previous evaluations, Plaintiff failed to complain about discrimination of any form. (Id.; N.T. Pl. at 127-28). Instead, he complained merely that (1) his evaluation was not objective; (2) he was performing the same job as previous years; (3) he was doing more reports; (4) he was "doing more than ever;" and (5) he "never made a material mistake." (Ex. H at 0005).

Despite the fact that County policy called for termination after two consecutive unsatisfactory evaluations, and despite the clear warning on his evaluation that it would be forwarded to the Director of Administration for further review, Plaintiff admits that he still failed to complain to his supervisors or the Human Resources Department that he believed that the evaluation was the result of discrimination.[18] (N.T. Pl. at 119-21).

Because the 2000-2001 evaluation was Plaintiff's second consecutive negative evaluation, in accord with County policy, Plaintiff was terminated by Director of Administration Klotz, who notified Plaintiff of his termination verbally and in writing.[19] (N.T. Pl. at 131; Ex. H

---

[17] During his evaluation meeting, Plaintiff complained only of his "concern" regarding the appearance "to people outside the County" of his being merely an Accountant I, that it was an "insult" to call him an Accountant I, that his work was "exceptional" and that his appearance warranted a more positive evaluation. (Ex. H at 0146-48).

[18] Plaintiff claims that around this time, he informed County employees Paul Werrell, Andy DiAngelo, John Sikora and Charlie Zeffenfield that he believed he was subject to discrimination because of his diabetes. (N.T. Pl. at 121-25). Nevertheless, Plaintiff admits that none of these individuals worked in Plaintiff's department at the County or was in Plaintiff's chain of command. (Id. at 126-27). Moreover, it is undisputed that none of these employees works in the Human Resources office.

[19] Since Plaintiff's termination, Plaintiff's Accountant I position has not been filled. (N.T. Gr. Hg. at 50-51). The duties associated with Plaintiff's original Grants Administrator position were given to his co-worker, George Samuelson. (N.T. Gr. Hg. at 51). Since that time, however, the Grants Administrator position has been eliminated because the County determined that the duties associated with that position were inappropriate for the Fiscal Department. (Id. at 50-51). Samuelson is still employed by the County, but has been reclassified to an Accountant II position, which involves more traditional accounting duties. (Id. at 51, 90).

957857v1

at 0055, 0256-57, Section II.B.). Although he was being terminated, Plaintiff still did not

complain about discrimination. (N.T. Pl. at 131-132).

Plaintiff claims that he failed to complain to Klotz because Klotz was "in on the situation

[of discriminating against Plaintiff] from . . . day one." (Id. at 132). As proof of Klotz's

involvement, Plaintiff cites a memo that Klotz wrote, documenting Plaintiff's unauthorized

entrance into the County prison.[20] (Id. at 133; Ex. H at 0230). Plaintiff also relies upon Klotz's

refusal to force Defendants Lazorik, Kahler and Kehm to sign a certification, created by Plaintiff,

attesting to the objective nature of their evaluations of Plaintiff's work. (N.T. Pl. at 134; see

discussion of certification, infra, at p.21). Finally, Plaintiff testified that he "assume[s]" that

Klotz reviewed all evaluations when they were written up and would perceive if Plaintiff's

evaluations were not objective.[21] (N.T. Pl. at 134).

C.    **Plaintiff's low blood sugar episodes at work**

During his employment with the County, Plaintiff had numerous low blood sugar

episodes at work. The incidents frequently required that an ambulance be called to tend to

Plaintiff. As discussed infra, the frequency of the episodes caused the County to make several

minor changes to Plaintiff's work conditions, all of which were designed to assist him.

During Plaintiff's first five weeks of employment with the County, he had three episodes,

two of which warranted the presence of emergency medics. (Ex. H at 0225-28). As a result of

the episodes, Defendant Lazorik obtained authorization from the Human Resources Department

to request that Plaintiff produce information from his physician about Plaintiff's condition and to

---

[20] As documented in Klotz's memo, Plaintiff entered the prison and walked toward an entrance for a secured area of the prison. (Ex. H at 0230). Klotz wrote that Plaintiff seemed to be "confused" and that the situation was "bazaar" [sic]. (Id.)

[21] While testifying about Klotz's presumed review of Plaintiff's evaluations, Plaintiff changed his testimony. Although he testified that he complained to Klotz about disparate treatment, Plaintiff also testified that, in fact, he did not inform Klotz that he suspected that he was a victim of discrimination. (N.T. Pl. at 82, 135-136).

-16-

957857v1

provide guidance as to how co-workers or supervisors should respond to Plaintiff when he experienced an episode. (Id.; N.T. Lazorik at 10-14).

Plaintiff's physician responded with a letter in which he explained the symptoms of a low blood sugar episode. (Ex. H at 0224). He wrote that an episode can be treated with orange juice or sugar tablets. (Id.) He further wrote that, "[Plaintiff] should be able to perform the essential functions of his job…" (Id.; N.T. Pl. at 189-90).

Plaintiff's numerous low blood sugar episodes at work resulted in situations that not only were threatening to his own health and safety, but to that of others. For example, on one occasion, Plaintiff was found by a County employee[22] to be passed out while sitting in his car, with the engine running, in the County's parking garage. (N.T. Pl. at 84; N.T. Nisbet at 44-46; Ex. H at 0221). An ambulance was called, and a Sheriff's Deputy had to park Plaintiff's car for him. (Ex. H at 0221). In July, 1999, as a result of Plaintiff's episode in the garage, the Human Resources Department assigned Plaintiff to a County parking garage that had fewer cars and therefore posed less of a danger to Plaintiff and other County employees who parked on County property. (Id. at 84; N.T. Nisbet at 50, 51-52, 53-54, 56; N.T. Baker at 29-30).

On May 19, 1999, after another low blood sugar episode, Plaintiff's wife, JoAnn Franks, wrote a letter to Defendant Lazorik providing some information about Plaintiff's diabetes and guidance as to how to handle Plaintiff when he experienced an episode. (Ex. H at 0045-46). Mrs. Franks wrote that Plaintiff should drink orange juice or soda, or chew a glucose tablet. (Id.) Mrs. Franks also wrote, "I sincerely thank you for your assistance and understanding as well as your team's efforts in assisting [Plaintiff] with his recent low sugar episodes. How can I ever thank you and everyone else for this assistance?" (Id. at 0046).

---

[22] Plaintiff could not recall the employee's name but testified that "she knew of my condition and harassment." (N.T. Pl. at 172).

Because of Plaintiff's frequent episodes at work, Nisbet informed Plaintiff that he must undergo an independent medical examination to determine his fitness to perform his job. (Ex. H at 0207). Plaintiff submitted to an examination in early November, 1999, which revealed that Plaintiff was not properly administering his own insulin. (Id. at 0207, 0208).

Because of the frequency and seriousness of Plaintiff's low blood sugar episodes, Kahler, Kehm and Lazorik monitored and documented his episodes. (N.T. Lazorik at 14-15, 19-22, 28; N.T. Nisbet at 59-60; N.T. Baker at 40, 44-45, 47-48, 69). The documentation was provided to Defendant Nisbet, who was kept informed of Plaintiff's episodes because of her position as Risk Manager for the County. (N.T. Nisbet at 34-35).

On January 3, 2000, Plaintiff had a low blood sugar episode at work, and Kahler was informed by Plaintiff's wife that it pertained to Plaintiff's adjustment to use of an insulin pump. (Ex. H at 0141). Because Plaintiff's wife warned that future episodes may occur as Plaintiff learned to use the pump, Plaintiff was instructed to remain out of work[23] until he produced a note from his physician certifying that Plaintiff knew how to operate the pump. (Id.)

On January 7, 2000, Plaintiff's physician wrote a letter to Defendant Nisbet, explaining that Plaintiff switched his insulin regime from self-injection to an automatic pump, although the physician wrote that the pump was not the sole reason for the recent low blood sugar episode. (Ex. H at 0140). Plaintiff's physician wrote that Plaintiff "understands the use of the pump." (Id.)

On February 14, 2000, Plaintiff sent a written complaint to Nisbet about his parking spot assignment. (N.T. Pl. at 173-74; Ex. H at 0199). In his complaint, Plaintiff claimed that he had taken additional steps to prevent low blood sugar episodes at the end of the day and before he

---

[23] Plaintiff was informed that he would not be required to use sick leave or paid leave time since he would be out of the office at the County's instruction. (Id.)

drives. (Ex. H at 0136). Nevertheless, Plaintiff admits that he had a low blood sugar episode at the end of the day only two days prior to writing his memo, as well as numerous episodes after writing the memo. (N.T. Pl. at 174-75; N.T. Nisbet at 54-56). In response to Plaintiff's complaint, Nisbet advised that she would reconsider permitting Plaintiff to park his vehicle in the "general area of the County lot" if Plaintiff experienced "no further [low blood sugar] incidents during the next six months." (Ex. H at 0139, 0178; N.T. Nisbet at 54, 64-65; N.T. Baker at 30).

In April, 2000, the County expressed to Plaintiff its ongoing concerns for his welfare in light of numerous and continued low blood sugar episodes, his failure to cooperate with paramedics during such episodes, and his attempts to leave the workplace and drive during such episodes. (Ex. H at 0139). As a result, Defendant Nisbet informed Plaintiff that after each episode, he was not permitted to return to work until he produced a physician's note clearing his return. (Id.; N.T. Pl. at 138, 186-87, 191-92).

Plaintiff continued to have low blood sugar episodes, many of which occurred toward the end of the work day. (N.T. Nisbet at 66-67; Ex. H at 0139, 0178). Plaintiff's numerous episodes rendered him incapable of caring for himself or even recognizing that he was experiencing an episode or needed help. (N.T. Pl. at 191; N.T. Nisbet at 66-67; Ex. H at 0139, 0178). As a result, Plaintiff was instructed by Defendant Nisbet not to work any later than 4:00 p.m., because there were no other employees in the office after that time who could assist Plaintiff in the event he suffered a low blood sugar episode. (N.T. Nisbet at 66-67; Ex. H at 0139, 0178).

Plaintiff admits that the County had reason to be fearful of him being alone in the office and passing out from a low blood sugar episode. (N.T. Pl. at 186). Plaintiff also admits that the letter from Defendant Lazorik to Plaintiff's physician, seeking information about Plaintiff's condition and how County employees could help Plaintiff when he experienced a low blood

-19-

sugar episode, was warranted. (Id. at 188). Plaintiff further admits that in response to an inquiry from Defendant Nisbet as to what else the County could do to accommodate him, Plaintiff responded that "there was nothing more the County can do at this point and complimented the efforts of [Lazorik] to assist him." (N.T. Pl. at 158-59; Ex. H at 0044). Plaintiff also was told that he should contact Nisbet if he had any "questions or concerns." (Ex. H at 0044).

**D.    Plaintiff failed to utilize the County grievance during his employment.**

Plaintiff alleges in this matter that he was subject to disparate treatment because of his low blood sugar episodes. Nevertheless, Plaintiff admits that he failed to complain to anyone in his chain of command or to the Human Resources Department about the perceived treatment, despite being given multiple opportunities to do so. (See discussion, supra, at pp. 8-16).

Plaintiff admits that that he received the County's policies and procedures but failed to utilize the grievance procedure. (N.T. Pl. at 125, 160-61).

Q. Why didn't you use the grievance process as part of your termination?

A. Because I really didn't know about it.

Q. You told me you received the handbook and policies, correct?

A. I didn't read that part about it okay... I didn't expect to be fired. But then, again, I did expect to be. It was a contradiction. It was like black and white. I didn't think they would take it to this gravity [sic]. But then again, I was afraid of that happening. I have a wife, a child, and I have responsibilities . . .

(Id. at 125-6).

Plaintiff claims that he failed to complain to Nisbet, the County's Human Resources Director, about discrimination because Plaintiff "[did not] know what experiences she had in human services." (N.T. Pl. at 160-62).

Q. So you didn't have any faith in [Nisbet] to assist you with what you perceived to be discrimination; is that correct?

957857v1

A. That's correct. Especially since even assigning the parking spots, it was, right from the beginning, just harassment, a game plan, something to make me lose my temper and just quit.

(Id. at 162).

1.    **Plaintiff utilized the County's grievance procedure after his termination and was not reinstated because he failed to show that his evaluations were without merit.**

After he was terminated, Plaintiff filed a broad, somewhat incoherent 8-page grievance. (Ex. H at 0079-86). The grievance alleged that Plaintiff was subject to discrimination on the bases of age and disability. (Id.)

The grievance contained a copy of a "certification" that Plaintiff drafted for his supervisors' signatures, 'verifying' that their evaluations of him were objective. (Ex. H at 0080; N.T. Pl. at 147-49). The "certification" created by Plaintiff stated as follows:

Objective manner is here by [sic] defined as: That procedure which is done in the customary mode of acting, existing only in relation to the knowing subject or the sensible world, being observable or verifiable especially by the scientific methods, and not done for the personal gains.

(Ex. H at 0080).

Plaintiff included as part of his grievance the refusal by his supervisors to sign the certification.[24]

(Id.; N.T. Pl. at 148-49).

Plaintiff next complained in his grievance that he overheard supervisor Kahler[25] make three allegedly offensive remarks to "more than just one employee:"

(1) Did the U.S. get an astronaut on the moon?

---

[24] Plaintiff testified that he created the certification because he thought "it was just one way maybe to improve how they perceived me or my evaluations, to see if they would show a little more truth." (N.T. Pl. at 150).

[25] Plaintiff testified that he did not believe that Defendant Kahler was good at his job, performed good work, or was qualified to be Plaintiff's supervisor. (N.T. Pl. at 168-170). In his grievance, Plaintiff was sharply critical of Kahler, writing that Kehler was unprofessional, "project[ed] his own faults," was in denial about his own work errors, and should "get the facts" before coming to conclusions about Plaintiff. (Ex. H at 0097, 0103).

(2) Did the government find a replacement for President John F. Kennedy?

(3) Then, . . . don't let the door hit you in the ass.

(Ex. H at 0081).

At his deposition, however, Plaintiff was inconsistent in his testimony about the alleged

statements.  (N.T. Pl. at 112-13).

Q.  Now, you wrote [in your grievance], I overheard Brian. L. Kahler, Deputy
Fiscal Officer, saying this to more than just one employee.  Did I read that
accurately?

A.  That's correct.

Q.  But you testified [earlier] here today that he actually said these statements to
you, correct?

A.  The part is this is what he said that he said to other people in the conversation
I had before, where I had a grievance, as I stated to you earlier, where I said, you
know, I wasn't happy with how I was being different – being treated differently
by the three of them.  And that's when he brought this statement up, and he said
he said it to several people in an arrogant way.

Q.  So [Kahler] told you he had made those statements to other people?

A.  He said the same reflection [sic] to me, the same reflection to me yes.  If I'm
unhappy with the situation, yes.

Q.  But you put here –

A.  I put here –

Q.  I overheard Brian Kahler saying this to more than just one employee.  Did you
overhear him saying it or did he tell you he made those statements?

A.  I heard both, okay?  I overheard it, and he did say it to me.

Q.  So you overheard him making these statements to at least one other
employee?

A.  Yes.

Q.  What employee?

-22-

A.  I can't remember.

Q.  Was it more than one employee?

A.  It was more than one employee.  It was four-and-a-half years of working, and in some cases, there were several people that did leave employment with the County.

Q.  Can you remember the identity of any individual to whom Brian Kahler made these statements?

A.  No.  Because it was only from either hearsay, okay, I heard other people quote that part that he said to other people.

(Id. at 152-53).

Plaintiff's grievance also included a lengthy, unsigned statement allegedly written by his wife regarding a low blood sugar episode that Plaintiff suffered at work.  (Ex. H at 0083; N.T. Pl. at 155-56).  The incident, in which Plaintiff's supervisors allegedly mocked Plaintiff for having a seizure, purportedly occurred exactly one month after a letter written by Plaintiff's wife to Lazorik in which she praised their assistance and understanding in helping Plaintiff with his diabetic seizures.  (Ex. H at 0083; N.T. Pl. at 157-58; see discussion, supra, at p.17).

Plaintiff's grievance next complained that Defendant Kehm did not do more for Plaintiff when Plaintiff suffered a low blood sugar episode.  (Ex. H at 0084).  Specifically, Kehm did the "minimum" of talking to Plaintiff or assisting Plaintiff in taking something with sugar, and then calling for the "security guard" or the ambulance.  (Id.)  Plaintiff testified that Kehm should have forced Plaintiff to take something with sugar in it, despite the fact that Plaintiff admits he could be uncooperative when experiencing a low blood sugar episode.  (N.T. Pl. at 163, 191, 194; Ex. H at 0166, 0193).

A.  . . . [Kehm] sometimes asked me, check your blood or slightly say – couple times he did say drink the soda, but he didn't say drink it.

Q.  So he didn't force you to take something with sugar in it?

-23-

A. Right, he did not.

Q. And that's what you would have liked him to do?

A. If he did, I would have taken it, and it wouldn't have been necessary for the ambulance. . . They just wanted me to have low blood sugar so that I would disrupt the office so eventually, people at the top of the pole would agree with their evaluations and get rid of me for that reason.[26]

(N.T. Pl. at 163-65).

Plaintiff wrote in his grievance that he was harassed by his supervisors' "attitude toward my handicap. Non [sic] help, just make it an incident (circus)." (Ex. H at 0085).

Plaintiff also suggested that his mailbox was vandalized by Defendant Kahler or Defendant Kehm in an effort to "scare" Plaintiff. (Id. at 0086; N.T. Pl. 2[27] at 9-10). Plaintiff admits, however, that he does not know who is responsible for vandalizing his mailbox. (N.T. Pl. 2 at 12).

Plaintiff concluded his grievance with the statement that "Lehigh County has some very good employees and managers. On the other hand, The [sic] Lehigh County has some very bad managers, i.e., my three superiors." (Ex. H at 0086).

After exhausting the first three steps of the County grievance process, Plaintiff was given a hearing with Defendant Nisbet, as Step IV of the process. (N.T. Pl. at 139). Plaintiff videotaped the meeting.[28] (Ex. L). As the hearing progresses, Plaintiff's inability to provide a basis for his grievance becomes clear. (Id.) He admits to gaps in his "evidence," dodges several

---

[26] Plaintiff testified several times that he believed that his supervisors wanted him to experience low blood sugar episodes or refused to assist Plaintiff until it was time to call emergency medics. (N.T. Pl. at 192-93, 195).

[27] "N.T. Pl. 2" refers to pages from the transcript of Plaintiff Timothy Frank's deposition, taken on October 3, 2003, and attached hereto as Exhibit "J."

[28] The videotape, which starts out with footage of Plaintiff's damaged mailbox, is approximately 58 minutes in length. See also, transcription of Nisbet's assistant's notes from the hearing. (Ex. H at 0279-81).

-24-

of Nisbet's questions, expresses his belief that his ability to obtain a CPA license is sufficient to prove his ability as an Accountant, decries the inaccuracy of the local church clock, and admits his tardiness to work. (Id.) He concludes by thanking Nisbet for being "very helpful" and says that he is willing to "forgive" everyone. (Id.)

During the hearing, Plaintiff was specifically asked by Nisbet why he thought his evaluations were discriminatory. (Id.; N.T. Pl. at 140-41). Plaintiff repeatedly refused to respond to her question, claiming that he had spoken with "somebody" and was advised not to answer that question. (N.T. Pl. at 140, 144). He eventually referred to the alleged incident in which his supervisors mocked him. (See discussion, supra, at p.23).

After the hearing, Nisbet denied Plaintiff's grievance. (Ex. H at 0074). Plaintiff admits, however, that he "thought [he] presented [his] case well enough, that [he] thought [he] did say everything that was needed." (N.T. Pl. at 140).

Plaintiff appealed Nisbet's decision and was granted a hearing, which was held on October 26, 2001, in front of the Lehigh County Personnel Review Board.[29] At that hearing, Plaintiff was represented by counsel and gave sworn testimony. Plaintiff's counsel also had the opportunity to cross-examine witnesses, including Defendants Kahler and Klotz. The Review Board determined that Plaintiff's evaluations were conducted in accordance with the County's policies and procedures and that Plaintiff's termination was "proper under the circumstances." (Ex. H at 0056-71).

E.    **Miscellaneous Issues and Incidents, and Plaintiff's Attitude**

Plaintiff engaged in various instances of bizarre or inappropriate behavior at work. For example, Plaintiff had an altercation with a County employee, Carol Spaeth ("Spaeth"), which

---

[29] The Review Board consisted of three individuals who did not work with Plaintiff during his tenure at the County.

957857v1

Spaeth felt was serious enough to report to the Human Resources Department and Defendants Kahler and Lazorik. (Ex. H at 0049, 0202; N.T. Nisbet at 48). Spaeth apparently parked in a parking spot that Plaintiff believed was his alone. (Ex. H at 0049; N.T. Nisbet at 48). According to Spaeth, when Spaeth attempted to leave the parking lot in her car, Plaintiff pulled in behind her with his car to block her, exited his car, blew cigarette smoke in her face, and verbally assaulted her. (Ex. H at 0049).

Plaintiff had to be warned about his inappropriate use of the e-mail system at work, as well as engaging in personal business while on work time. (Ex. H at 0051, 0205). Plaintiff also used work time to take a "tour" of a County building out of "curiosity." (Ex. H at 0155). The building that Plaintiff toured, the Old Colonial Building, is in disrepair and therefore is dangerous. (Id.) Defendant Kahler expressed concern to Plaintiff about his "tour" of the hazardous property and his unauthorized use of work time. (Id.) Plaintiff responded that the "tour" was taken on his own time and was of no concern to Kahler's. (Id.) On one of the many occasions when Plaintiff was tardy to work and was confronted by Lazorik about his tardiness, Plaintiff responded, "Just remember, it's quality, not quantity." (N.T. Pl. at 181; Ex. H at 0023).

Plaintiff does not dispute that he may have gone to a Circuit City store during work hours and called his supervisor, Kahler, from a cell phone in order to test the phone. (N.T. Pl. 2 at 22). He also does not dispute that he may have run his fingers along the side of a cake brought in by an employee for her birthday.[30] (N.T. Pl. at 166-67). Plaintiff also kept a container of milk in

---

[30] Plaintiff admits that he pricked the fingers of both his hands 6-8 times per day to obtain blood test his insulin. (N.T. Pl. at 16).

the office refrigerator from which he drank directly in order to dissuade other employees from using his milk.[31] (N.T. Pl. 2 at 28-29; N.T. Gr. Hg. at 142).

Based upon all of the above, Plaintiff has failed to produce any evidence that Defendants discriminated against him in violation of the ADA or PHRA.

## II.    ARGUMENT

### A.    Summary Judgment Standard

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Hersh v. Allen Prods. Co., Inc., 789 F.2d 230, 232 (3d Cir. 1986). Summary judgment should be granted if no reasonable trier of fact could find for the non-moving party. See Fed. R. Civ. P. 56(c); Radich v. Goode, 886 F.2d 1391, 1395 (3d Cir. 1989).

"Although the movant has the initial burden of demonstrating the absence of genuine issues of material fact," the non-moving party cannot rely upon speculation, conjecture or his subjective belief of the facts or arguments asserted in his brief. Giangreco v. United States Life Ins. Co., 168 F. Supp. 2d 417 (E.D. Pa. 2001).

Defendants are entitled to summary judgment in this case because Plaintiff has failed to establish a requisite element of his prima facie case, that he is a qualified individual with a disability. Alternatively, Defendants have offered non-discriminatory reasons for Plaintiff's discharge, and there is no evidence of pretext. Finally, Plaintiff has failed to prove that Defendants failed to provide requested accommodations or engage in the interactive process.

---

[31] Defendant Kahler testified that he believed that the jug of milk from which Plaintiff drank directly was the "community" jug, not Plaintiff's jug. (N.T. Gr. Hg. at 85).

957857v1

**B.    Discrimination Under the Americans with Disabilities Act and Pennsylvania Human Relations Act**

Plaintiff alleges that the County discriminated against him because of his diabetes in violation of the Americans with Disabilities Act ("ADA") and Pennsylvania Human Relations Act ("PHRA"), and failed to accommodate him under the PHRA.[32]  See Complaint at Counts I and II.  Plaintiff has failed to produce sufficient evidence to support these claims.

The ADA provides that

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).

In order to establish a <u>prima facie</u> case under the ADA,[33] Plaintiff must demonstrate that (1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation by the employer; and (3) he has suffered an adverse employment decision as a result of discrimination. <u>Shaner v. Synthes</u>, 204 F.3d 494, 500 (3d Cir. 2000).  Here, Plaintiff is unable to establish the second prong of the <u>prima facie</u> case.[34]

---

[32] The Complaint asserts a claim for failure to accommodate only under the PHRA.

[33] The same standards apply to a PHRA claim for disability discrimination. <u>See</u> <u>Kelly v. Drexel Univ.</u>, 94 F.3d 102, 105 (3d Cir. 1996).

[34] It is not clear that Plaintiff is "disabled" under the ADA since his blood sugar can be regulated with insulin. <u>See</u> <u>Sutton v. United Air Lines, Inc.</u>, 527 U.S. 471 (1999).  Indeed, there has been no evidence presented that Plaintiff's condition is anything but controllable through administration of insulin and careful attention to food intake.  (Ex. L).  Nevertheless, since Plaintiff was not qualified to perform his job, regardless of his alleged "disability," Defendants do not explore this argument at this time.  However, Defendants reserve the right to present this argument at trial if they do not prevail on summary judgment.

-28-

1.    **Plaintiff Cannot Establish That He Was Otherwise Qualified To
Perform The Essential Functions Of His Job.**

A "qualified individual," as that term is defined for purposes of the ADA, is "an

individual with a disability who, with or without reasonable accommodation, can perform the

essential functions of the employment position that such individual holds or desires." 42 U.S.C.

§ 12111(8). In order to succeed on his ADA claim, Plaintiff must prove, inter alia, that he was

qualified for the position of Accountant I. See Gaul v. Lucent Technologies, Inc., 134 F.3d 576,

580 (3d Cir. 1998). Specifically,

> The determination of whether an individual with a disability is "qualified" should
> be made in two steps. The first step is to determine if the individual satisfies the
> prerequisites for the position, such as possessing the appropriate educational
> background, employment experience, skills, licenses, etc.
>
> The second step is to determine whether or not the individual can perform the
> essential functions of the position held or desired, with or without reasonable
> accommodation.

29 C.F.R. Pt. 1630, App. § 1630.2(m) (2003). See also Deane v. Pocono Medical Ctr.,
142 F.3d 138, 145 (3d Cir. 1998).

Here, Defendants do not dispute that Plaintiff has established the first prong of the two-

part test to determine whether he was a "qualified" individual, as he possesses the requisite

educational degrees and CPA license. See discussion, supra, at p.3.

Nevertheless, in order to establish that he is otherwise qualified under the ADA, Plaintiff

also must establish that he was capable of performing his job with or without reasonable

accommodation. 29 C.F.R. Pt. 1630, App. § 1630.2(m) (2003). See also Deane, 142 F.3d at

146. The purpose of this requirement is to "ensure that employers can continue to require that all

applicants and employees, including those with disabilities, are able to perform the essential

functions, i.e., the non-marginal functions of the job in question." Deane, 142 F.3d at 147

(citation omitted).

In making a determination as to whether Plaintiff is a "qualified individual," the Court first must consider whether Plaintiff can perform the essential functions of his job without accommodation. (Id. at 146). If so, then Plaintiff is a qualified individual under the ADA. Id. If Plaintiff cannot perform the essential functions of his job without accommodation, the court then must consider whether he could perform the essential functions of the job with a reasonable accommodation. Id. If he could not, then Plaintiff is not a qualified individual and he is unable to establish a prima facie case of discrimination.

Here, there has been no evidence produced by Plaintiff that his work product was satisfactory with or without a reasonable accommodation.[35] Indeed, there has been an abundance of evidence that Plaintiff was incapable of performing the essential functions of his job. The testimony of all of Plaintiff's supervisors in this matter is that Plaintiff's work performance was consistently deficient for the duration of his employment, albeit with temporary improvement when Plaintiff was reclassified to an Accountant I.

Plaintiff's performance deficiencies, for both essential and marginal functions, were described to Plaintiff in detail with each performance evaluation. Indeed, during Plaintiff's grievance hearing, Defendant Kahler discussed multiple examples of Plaintiff's performance deficiencies, including situations in which financial records were inconsistent, incorrect data was submitted to Kahler, and templates were given incorrect dates so that the data presented did not coincide with the dates presented. (N.T. Gr. Hg. at 44-48, 95-96, 106, 109-13; N.T. Nisbet at 76). In each case, Plaintiff had presented his work to Kahler as a "final" product, and in each case, Kahler caught the error before the documents were sent out from the office. (N.T. Gr. Hg.

---

[35] See discussion, infra, at pp. 39-45, regarding the deficiency of Plaintiff's job performance with the accommodations that he requested.

-30-

at 45, 47). Kahler explained that the Fiscal Department is "heavily audited" and that it is

"paramount" that its records be accurate and consistent. (N.T. Gr. Hg. at 44; N.T. Nisbet at 76).

Significantly, there has been no evidence to refute the fact that Plaintiff's work product

failed to meet the Fiscal Department's standards. In fact, Plaintiff has produced no evidence at

all, other than his own belief, to refute that his performance was deficient as described in his

evaluations.

Plaintiff admits that he was informed each year in writing by his supervisors of his poor

work performance. (N.T. Gr. Hg. at 151, 152, 154,). Moreover, Plaintiff admits that each year,

in conjunction with his evaluation, his supervisors met with him to discuss his evaluation. (N.T.

Gr. Hg. at 155). Plaintiff further admits that at each of these meetings, his supervisors explained

"some" of the deficiencies in Plaintiff's work. (N.T. Gr. Hg. at 155, 157). Although Plaintiff

alleges that he was not given "a narrative, a written and oral way of . . . improving his [sic]

performance," Plaintiff admits that his evaluations were accompanied by a letter from his

supervisors identifying the areas in which Plaintiff's work product was deficient. (N.T. Gr. Hg.

at 156).

Plaintiff testified multiple times that he disagreed with his supervisors' opinion of his

work, going so far as to testify that because he disagreed with his supervisors' opinions, their

opinions were not objective. (N.T. Gr. Hg. at 156). Plaintiff testified, in fact, that all three of his

supervisors were wrong on every one of Plaintiff's evaluations. (N.T. Gr. Hg. at 158). Plaintiff

testified that he did not need any improvement, that his work was "astoundingly accurate," and

that each of his supervisors was wrong - and Plaintiff was right - each year for four (4) years.

(N.T. Gr. Hg. at 154, 158-59).

Q.    Do you think that your work product was superior to other Accountant I's?

-31-

957857v1

A.    Accountant I's, yes....

Q.    So you were good at your job?

A.    I was good at my job, yeah.

Q.    And you didn't deserve the evaluations you got?

A.    That's correct.

Q.    And you knew how to do your job, correct?

A.    Yes.

Q.    And you didn't need your supervisors telling you how to do your job, right?

A.    That's right.

(N.T. Pl. at 170).

Plaintiff's subjective "disagreement with [his supervisor's] assessment of [his] job performance is not sufficient to raise a presumption of discrimination." Bullock v. Children's Hosp., 71 F. Supp. 2d 482, 490 (E.D. Pa. 1999) (finding that the plaintiff failed to establish a prima facie case of discrimination, despite her belief that "her termination was unfair and [she] is at a loss to explain why [her supervisor] faulted her performance").

A plaintiff must establish that he "performed [his] job satisfactorily." Stove v. Philadelphia Sch. Dist., 58 F.Supp.2d 598, 601 (E.D. Pa. 1999), aff'd 216 F.3d 1077 (3d Cir. 2000) (granting summary judgment because, inter alia, there was no evidence produced that the plaintiff was qualified for his position, owing to performance problems), cert. denied., 121 S.Ct. 568 (2000). See also Gaspar v. Merck and Co., Inc., 118 F. Supp. 2d 552, 556 (E.D. Pa. 2000) (finding that the plaintiff was not qualified for his position because his evaluations "exhibit[ed] a wide range of problems with his performance" and the plaintiff offered "no evidence that these repeated and consistent evaluations were pretextual, other than his own disagreement").

-32-

The burden of establishing his qualification for his job lies with Plaintiff. See Dayoub v. Penn-Del Directory Co., 48 F. Supp. 2d 486, 494 (E.D. Pa. 1999) ("The Court recognizes that [the plaintiff] must still carry his ultimate burden of proving that at the time of his termination that he was capable of performing the essential duties, with or without reasonable accommodation"). While Plaintiff has produced a great deal of evidence that it was his belief that his work product was superior, not only to his co-workers, but to his supervisors, his subjective belief about his own work product is insufficient to establish that he was qualified for the position. See Gaspar, 118 F. Supp. 2d at 556.

Compare Sempier v. Johnson & Higgins, 45 F.3d 724, 729 (3d Cir. 1995) (writing that the fact that the plaintiff performed his job satisfactorily for 20 years, including multiple promotions, implied for purposes of summary judgment that he was qualified for his job); Jalil v. Avdel Corp., 873 F.2d 701 (3d Cir. 1989) (writing that the plaintiff proved his qualification for his position by virtue of his eight years of satisfactory performance of duties, including his promotion to the "lead man" position in his department), cert. denied, 506 U.S. 903 (1992), reh'g denied, 506 U.S. 1029 (1992).

Based upon all of the above, Plaintiff has failed to establish that he could perform the essential functions of the Accountant I position. Therefore, Plaintiff cannot establish the second prong of the prima facie case of discrimination under the ADA or PHRA.[36]

    2.    **Plaintiff Has Failed To Produce Evidence That The County's Legitimate Business Reasons For His Discharge Were A Pretext For Illegal Discrimination.**

In the event that a plaintiff establishes a prima facie case of discrimination or failure to accommodate, the burden of production shifts to the defendant to articulate a legitimate, non-

---

[36] As stated supra at n.35, Plaintiff also was incapable of performing the essential functions of the Accountant I position even with accommodations. See discussion, infra, at pp.39-45.

discriminatory reason for its actions. See Shaner, 204 F.3d 494, 500 (3d Cir. 2000); Walton v.

Mental Health Assoc. of Southeastern Penn., 168 F.3d 661, 668 (3d Cir. 1999). The plaintiff

may defeat summary judgment by showing evidence from which a factfinder would either (1)

disbelieve the reasons proffered by the employer or (2) believe that discrimination was more

likely than not the true reason for the employer's action. See Shaner, 204 F.3d at 500-501;

Walton, 168 F.3d at 668.

To establish pretext, a complainant must provide evidence that would "allow a factfinder

reasonably to infer that each of the employer's proffered reasons . . . was either a post hoc

fabrication or otherwise did not actually motivate the employment action." Fuentes v. Perskie,

32 F.3d 759, 762 (3d Cir. 1994). The Third Circuit Court of Appeals places a difficult burden on

a plaintiff by requiring a plaintiff who has established a prima facie case to submit evidence

which:

> 1) casts sufficient doubt upon each of the legitimate reasons proffered by the
> defendant so that a factfinder would reasonably conclude that each reason was a
> fabrication; or

> 2) allows the factfinder to infer that discrimination was more likely than not a
> motivating or determinative cause of the adverse employment actions to survive a
> summary judgment when the defendant offers legitimate reasons for its
> employment action.

Id. at 762, 765 (3d Cir. 1994).

The Court of Appeals wrote that "the plaintiff cannot simply show that the employer's

decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory

animus motivated the employer, not whether the employer is wise, shrewd, prudent, or

competent." Shaner, 204 F.3d at 501; Fuentes, 32 F.3d at 765. See also Sempier, 45 F.3d at

731; Ezold v. Wolf, Bock, Schorr and Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992); cert.

denied, 510 U.S. 826 (1993).

Instead, a "plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons." Shaner, 204 F.3d at 501.

The employer is entitled to establish standards or criteria for making employment decisions. Simpson v. Kay Jewelers, 142 F.3d 639, 647 (3d Cir. 1998). A plaintiff's subjective beliefs alone are not enough to meet this burden; he must be able to produce something more. See e.g., Wilson v. U.S. Air Express, C.A. No. 98-1190, 1999 U.S. Dist. LEXIS 14250, at *17 (E.D. Pa. Sept. 15, 1999) (granting the defendant's motion for summary judgment in Title VII case where the plaintiff's only evidence of pretext was her own belief that defendant discriminated against her). Moreover, a plaintiff may not substitute what he or she considers to be the relevant qualifications for a particular position for the employer's stated qualifications; instead, "the focus is on the criteria identified by the employer, not the criteria only the plaintiff thinks are important." Simpson, 142 F.3d at 648; see also Billet v. CIGNA Corp., 940 F.2d 812 (3d Cir. 1991) (writing that the plaintiff's "view of his performance is not at issue; what matters is the perception of the decision maker . . . The fact that an employee disagrees with an employer's evaluation of him does not prove pretext"); Rabinovitz v. Pena, 89 F.3d 482, 487 (7th Cir. 1996) (writing that the plaintiff's "own opinions about his performance or qualifications [do not] give rise to a material factual dispute.").

In Simpson, a demoted employee argued that her employer's use of sales quotas as an evaluation method was suspect because she felt evaluation scores were more indicative of performance, and therefore argued that the employer's use of the quota method of evaluation was enough evidence of pretext to withstand a motion for summary judgment. Simpson, 142 F.3d at

-35-

647. The Third Circuit Court of Appeals disagreed, holding that an employer's method of

evaluating employees was "not for the court (or factfinder) to decide." Id. The court wrote that

it did not matter whether the employer made the "best, or even a sound, business decision;" all

that mattered was whether discrimination was the real reason for making the decision. Id.

(quoting Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1109 (3d Cir. 1997) (citation

omitted)).

    In other words, a plaintiff cannot avoid summary judgment merely by arguing that the

employer's decision was wrong. See Sylvester v. Unisys Corp., C.A. No. 97-7488, 1999 U.S.

Dist. LEXIS 3607, at *50 (E.D. Pa. Mar. 25, 1999) (rejecting the plaintiff's claim that he was the

most qualified for a position because "at best, [the plaintiff] has argued that [the employer's]

evaluation of his qualifications for these positions was wrong").

> Barring discrimination, a company has the right to make business judgments on
> employee status, particularly when the decision involves subjective factors
> deemed essential to certain positions . . . [A]n employer's articulated reasons are
> not incredible simply because the employee asserts that such is the case . . . A
> plaintiff has the burden of casting doubt on an employer's articulated reasons for
> an employment decision. Without some evidence to cast this doubt, this court
> will not interfere in an otherwise valid management decision. To require less
> would be to expose to litigation every management decision impacting on a
> protected party.

Billet, 940 F.2d at 825, 828.

    Even if this Court determines that Plaintiff established a prima facie case of disability

discrimination, Plaintiff cannot establish that the reason given for his discharge, his deficient

performance, was pretext for discrimination because he has produced no evidence, other than his

own opinion, that his performance was satisfactory. See Sempier, 45 F.3d at 731 (interpreting

Billet, 940 F.2d 812, as standing for the proposition that an employee's assertions of his own

good work product quality were "insufficient to prevent summary judgment where the employer

produced performance reviews and other documentary evidence of misconduct and insubordination that demonstrated poor performance").

Plaintiff admits that the basis for his contention that his supervisors' evaluations were not objective was his disagreement with their opinions. (N.T. Gr. Hg. at 156, 163). Plaintiff testified that, in his opinion, Kahler was not qualified to be his supervisor and Plaintiff did not need to improve his work. (N.T. Pl. at 168-69; N.T. Gr. Hg. at 158-59). Plaintiff also makes the implausible claim that he was never made aware that his performance was deficient. (N.T. Gr. Hg. at 136). To the contrary, it is undisputed that Plaintiff received criticism of his work performance in each of the four (4) years that he worked at the County. (See discussion, supra, at pp. 8-16).

Plaintiff has not produced any evidence suggesting that his poor evaluations were based upon anything other than his deficient performance. While Plaintiff may disagree with the decision to terminate him, this is not evidence of discrimination. See Billet, 940 F.2d at 816 (writing that in order for indirect evidence to establish pretext, the evidence "must be enough to support a reasonable inference that the reason given for the employment decision are pretextual. Merely reciting that [a discriminatory motive] was the real reason for the decision does not make it so"). Moreover, Plaintiff has failed to produce any evidence that the specific performance deficiencies, recited with each of his performance evaluations, did not provide the basis for Plaintiff's negative performance reviews.

Moreover, even if the County never informed Plaintiff that his performance was deficient, this alone would be inadequate to survive summary judgment. See Healy v. New York Life Ins. Co., 860 F.2d 1209, 1218 (3d Cir. 1988) ("Although we can sympathize with [the plaintiff's] situation and observe that employees will perform better if they receive feedback, we

-37-

note that from a legal perspective[,] managers are not compelled to convey their dissatisfaction to employees"), cert. denied, 109 S. Ct. 2449 (1989).

Plaintiff has failed to identify any comparators whose work product was equally as poor and who retained their jobs. While Plaintiff testified that he was familiar with the work product of other Accountants I, he admits that he was not familiar with the job duties of the other Accountants I and that he did not supervise them or review all of their work. (N.T. Gr. Hg. at 165-68). Indeed, the lone Accountant I that he cites as a comparator, Penny Zuber, he later characterized as a "secretary" and an "Accountant II." (N.T. Gr. Hg. at 140, 166-67; N.T. Pl. 2 at 41-42). Moreover, Kahler testified that no other Accountant I had the performance deficiencies that Plaintiff did. (N.T. Gr. Hg. at 49). Plaintiff admitted that Defendant Kahler was a difficult supervisor with other employees, not just Plaintiff. (N.T. Pl. 2 at 36-37).

Finally, even if the County's decision to terminate Plaintiff was wrong or based upon incorrect information, this does not constitute illegal discrimination as it is not the duty of the court to analyze the sufficiency or propriety of the discharge decision. Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 332 (3d Cir. 1995) ("We do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [anti-discrimination laws do] not interfere"). Rather, the court's duty is to determine whether the reasons proffered by the County for Plaintiff's discharge were truthful reasons. "We recognize that an employer may have any reason or no reason for discharging an employee so long as it is not a discriminatory reason . . . Our inquiry is limited to whether the employer gave an honest explanation of its behavior." Id. at 332.

In sum, no material questions of fact exist regarding Plaintiff's discharge claim.

-38-

Accordingly, Defendants respectfully request that Plaintiff's claim of discrimination in violation of the ADA and PHRA be dismissed.

### C.    Plaintiff Has Failed To Produce Any Evidence That The County Failed To Accommodate His Diabetes

Plaintiff alleges that Defendants failed to accommodate his diabetes under the PHRA. (See Complaint at ¶¶ 36-39). Nevertheless, Plaintiff has admitted multiple times that his diabetes did not interfere with or impede his job performance. (N.T. Pl. 2 at 25). Moreover, his own physician cleared Plaintiff to work and stated that Plaintiff could perform all the essential functions of his job. (Ex. H at 0224; N.T. Nisbet at 80). Finally, the County provided the very accommodations requested by Plaintiff's wife.

To establish a failure to accommodate under the PHRA,[37] Plaintiff must establish that (1) Defendant County is a covered employer; (2) he is disabled within the meaning of the statute; (3) he can perform the essential functions of the job, with or without reasonable accommodation; and (3) Defendant County knew of the disability and failed to provide Plaintiff with a reasonable accommodation. Panto v. Palmer Dialysis Ctr., No. 01-6013, 2003 U.S. Dist. LEXIS 5663, at *13-14 (E.D. Pa., Apr. 7, 2003) (citing Kralik v. Durbin, 130 F.3d 76, 78 (3d Cir. 1997)).

For reasons set forth, supra, in Section II.B.1., Plaintiff cannot establish the third prong, that he is "otherwise qualified" for his position. In addition, Plaintiff has failed to establish the fourth prong of the failure to accommodate prima facie case, that the County failed to provide Plaintiff with a reasonable accommodation.

An employer violates the ADA if it does not make "reasonable accommodations to the known physical or mental limitation of an otherwise qualified individual with a disability who is

---

[37] The same standards apply to a PHRA claim for disability discrimination. See Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996).

an . . . employee." 42 U.S.C. § 12112(b)(5)(A).  See also Taylor v. Phoenixville Sch. Dist., 184

F.3d 296, 311 (3d Cir. 1999).

A "reasonable accommodation" may include

(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9).

In Taylor, the Court of Appeals stated:

The ADA's regulations provide that: "To determine the appropriate accommodation, it may be necessary for the [employer] to initiate an informal, interactive process with the [employee] in need of the accommodation. This process should identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3).  Similarly, the EEOC's interpretive guidelines provide that: "Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation.  The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability." 29 C.F.R. Pt. 1630, App. § 1630.9 at 359.

Taylor, 184 F.3d at 311.

To show that an employer failed to engage in the interactive process, an employee must

show that:

(1) the employer knew about the employee's disability; (2) the employee requested reasonable accommodations or assistance for [his] disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith.

Id. at 319-20.

957857v1

"Both parties have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith." Mengine v. Runyon, 114 F.3d 415, 420 (3d Cir. 1977). While there are no "magic words" that an employee must request for an accommodation, "the employer must have enough information to know of "both the disability and desire for an accommodation." Conneen v. MBNA Am. Bank, 334 F.3d 318, 332 (3d Cir. 2003) (quoting Taylor, 184 F.3d at 313).

Presuming that Plaintiff's diabetes is a "disability" under the ADA,[38] it is undisputed that Defendants were aware of Plaintiff's diabetes. Therefore, Plaintiff can establish the first prong of the prima facie case for the interactive process. Taylor, 184 F.3d at 319-20.

The second prong requires that the employee request a reasonable accommodation for his disability. Id. at 319. It is undisputed that Plaintiff personally did not seek an accommodation from the County. Indeed, Plaintiff testified that his diabetes did not interfere with his ability to perform his job. (N.T. Pl. 2 at 25).

Nevertheless, on one occasion, Plaintiff's wife requested an accommodation on behalf of Plaintiff. On May 19, 1999, Plaintiff's wife wrote a note to Defendant Lazorik, enclosing information about Plaintiff's condition and providing guidance as to how people should respond to Plaintiff when he suffers a low blood sugar episode. (Ex. H at 0045-46). The only accommodation requested was to give Plaintiff orange juice, soda, or a glucose tablet. (Id.) No other accommodations were requested at any time by Plaintiff or his wife.

The Taylor Court made clear that the employee need not request an accommodation him- or herself, but may do so through a representative. Taylor, 184 F.3d at 314. Accordingly,

---

[38] As explained supra at n.34, Defendants do not concede at this point in time that Plaintiff is "disabled" for purposes of protection under the ADA or PHRA.

957857v1

Plaintiff's wife's request satisfies the second prong of the prima facie case, although Plaintiff continues to deny that any accommodation was necessary. (N.T. Pl. 2 at 25).

Nevertheless, Plaintiff has failed to establish the third prong of the prima facie case of the interactive process, that the employer did not make a good faith effort to assist the employee is seeking accommodation. To the contrary, the evidence in this case is clear that the County made a good faith effort to provide accommodations to Plaintiff. In Taylor, the Court of Appeals wrote that

> Employers can show their good faith in a number of ways, such as taking steps like the following: meet with the employee who requests an accommodation, request information about the condition and what limitations the employees has, ask the employee what he . . . specifically wants, show some sign of having considered the employee's request . . .

Taylor, 184 F.3d at 317.

Here, Defendants took those precise steps. Human Resources Director Janice Nisbet met with Plaintiff on multiple occasions regarding his diabetes and asked Plaintiff what the County could do for him. (N.T. Pl. at 158-59; Ex. H at 0044; see discussion, supra, at pp. 16-20). Plaintiff informed Nisbet that nothing else could be done and thanked the County for its efforts. (N.T. Pl. at 158-59; Ex. H at 0044).

The County also requested information from Plaintiff's physician regarding Plaintiff's condition and Plaintiff's limitations, if any. (Ex. H at 225-28). Plaintiff's physician responded that Plaintiff could perform the essential functions of the job. (Id. at 0224). The County again sought information from Plaintiff's physician when it learned that Plaintiff was changing his method of insulin injection and was told by Plaintiff's wife that the new method would result in additional low blood sugar episodes. (Ex. H at 0141). Once again, Plaintiff's physician cleared

-42-

Plaintiff to work and provided no additional information as to any accommodations that could be provided to Plaintiff. (Ex. H at 0140).

Defendants provided the very accommodations suggested by Plaintiff's wife and Plaintiff's physician. Plaintiff has failed to present any evidence of a single incident in which one of his co-workers did not attempt to persuade Plaintiff to ingest carbohydrates when he seemed on the verge of a low blood sugar episode. The undisputed testimony of Plaintiff's supervisors and co-workers was that they tried to get Plaintiff to eat or drink something to boost his blood sugar, monitored his situation, and called the paramedics when Plaintiff was in need of medical assistance. (N.T. Lazorik at 77-78; N.T. Nisbet at 80, 81). Plaintiff was never restricted in his ability to eat at his desk or when he otherwise needed to control his blood sugar level. (N.T. Pl. at 184-85). Indeed, Plaintiff's only claim about his supervisors' failure to accommodate him is that they should have "forced" him to eat rather than merely attempted to get him to eat. (Ex. H at 0084; N.T. Pl. at 163-65). He also makes a vague assertion about the Good Samaritan Act obligating the Defendants to provide care for Plaintiff, though he fails to specify what type of care he believes was required.[39] (Ex. H at 0084).

Plaintiff further complains that by contacting the paramedics when he was having an episode, his supervisors created a "circus"-like atmosphere. (Ex. H at 0085). Nevertheless, he fails to specify what other accommodation should have been provided. In fact, Plaintiff faults Defendants for calling an ambulance, which clearly was in Plaintiff's best interest, when he had low blood sugar episodes. (N.T. Pl. at 164-65).

---

[39] A similar argument was made in another case in which a diabetic drove home during a low blood sugar episode, crashed his car and died. The decedent's widow argued that under the Good Samaritan Act, the decedent's co-worker should have prevented the decedent from driving. The Seventh Circuit Court of Appeals wrote that in the absence of one of three narrow "special" relationships, there is no "Good Samaritan" requirement to assist a person in distress. Stockberger v. United States of America, 332 F.3d 479 (7th Cir. 2003).

-43-

Moreover, Plaintiff was granted the equivalent of a modified work schedule as he was never penalized for any time missed from work or disruption caused to the office when he experienced an episode and had to leave work. See Taylor, 184 F.3d at 319 (describing a modified work schedule as a possible "reasonable accommodation"). Indeed, there has been no allegation from Plaintiff, nor any evidence produced in this case, that he ever was penalized for his own lost time, or the lost time of his co-workers, due to any of his episodes. At best, Plaintiff has alleged – and Defendants admit – that certain minor changes were made to Plaintiff's work schedule and parking arrangements in an effort to minimize the possibility of a low blood sugar episode while he was at work or the potential harm to Plaintiff or others from such an episode.

Finally, Plaintiff has failed to establish the fourth prong of the prima facie case of the interactive process, that he could have been reasonably accommodated but for the County's lack of good faith. Plaintiff has failed to specify what accommodations should have been provided. Moreover, despite providing Plaintiff with the accommodations that he did request, Plaintiff's work performance continued to be deficient. There has been no evidence produced that, had the County provided some other accommodation to Plaintiff, his work performance would have been satisfactory. Plaintiff has never alleged that the performance deficiencies for which he was criticized on his evaluations were in any way related to the County's failure to provide an accommodation. To the contrary, Plaintiff simply denies that he had any performance deficiencies, and claims that his supervisors should not have been telling him how to do his job.

An employer is not required under the ADA to continue to employ an incompetent employee who happens to be disabled. See Taylor, 184 F.3d at 319 ("We are not holding that an employer who has made a good faith effort to accommodate must be saddled with a secretary who consistently makes typos and fails to deliver messages"). Moreover, it is immaterial

-44-

whether Plaintiff was accommodated because there is no evidence that he could have performed his job under any circumstances. See Donohue v. Conrail, 224 F.3d 226, 235 (3d Cir. 2000) (writing that a court will not find bad faith in the interactive process on the part of the employer where the plaintiff cannot show any accommodation that would have been reasonable).

Accordingly, as Plaintiff cannot satisfy the third and fourth prongs of the prima facie case of the interactive process, summary judgment is warranted.

**D.    Aiding And Abetting Under The Pennsylvania Human Relations Act**

Plaintiff asserts a claim of aiding and abetting against all Individual Defendants in this matter. (See Complaint at Count III). Plaintiff cannot establish this claim because (1) two of the Individuals Defendants were not his supervisors; (2) he failed to complain about what he perceived to be alleged discrimination against him; and (3) he failed to establish any violations of the PHRA.

The PHRA forbids "an person, employer, employment agency, labor organization or employee, to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice . . ." 43 Pa. Cons. Stat. Ann. § 955(e). Thus, unlike the ADA, the PHRA holds individuals liable for "aiding and abetting" in discriminatory practices. Dici v. Commonwealth, 91 F.3d 542 (3d Cir. 1996) (holding that only supervisory employees can be held liable because a non-supervisory employee's actions "cannot be said to 'intend' that his employer fail.")

For all of the reasons set forth at length above, Plaintiff was not subject to any discriminatory practice and therefore cannot establish an "aiding and abetting" claim. In the event this Court finds that discriminatory practices occurred, however, Plaintiff's aiding and abetting claims under the PHRA still must fail.

### 1. Jane Baker

Defendant Jane Baker is an inappropriate party. Plaintiff has made no allegations that she participated in any of his evaluations. Baker was not in Plaintiff's chain of command and was not even employed by the County when Plaintiff was terminated. There has been no evidence produced that Baker was aware of any alleged discrimination on the part of Plaintiff's direct supervisors. At best, Baker's only role in Plaintiff's employment was to assist him in obtaining his job. Accordingly, she is not an appropriate party for Plaintiff's individual liability claim.

### 2. Janice Nisbet

Nisbet was the Human Resources Director and therefore was not a "supervisor," at least not with regard to Plaintiff. She had no authority to hire, fire, or discipline any employee in the Fiscal Department, and played no role in Plaintiff's termination until Plaintiff's Step IV grievance hearing, after the termination decision already had been made. See Saidu-Kamara v. Parkway Corp., 155 F. Supp. 2d 436 (E.D. Pa. Aug. 13, 2001) (finding no individual liability under the PHRA where the plaintiff failed to produce evidence that the individual party participated in the plaintiff's discipline or termination).

Furthermore, at that hearing, Plaintiff refused to discuss with Nisbet the basis for his allegations of discrimination, and later admitted that he refused to do so because of his own "ego." (N.T. Pl. at 140-41, 144). It would be a perversion of the PHRA to permit Plaintiff to fail to explain his allegations of discrimination to the very person to whom he was required to grieve his termination and then successfully sue her for "aiding and abetting" in his discrimination.

### 3. Brian Kahler, Ted Kehm, Thomas Lazorik and Richard Klotz

For all of the reasons discussed supra, there has been no violation of the PHRA by any of these individuals and therefore, no individual liability under the PHRA.

-46-

### III.  <u>CONCLUSION</u>

For all of the foregoing reasons, Defendants County of Lehigh, Thomas Lazorik, Brian Kahler, Ted Kehm, Janice Nisbet, Jane Baker and Richard O. Klotz request that the Court grant their Motion for Summary Judgment and enter judgment in their favor and against Plaintiff, Timothy Franks.

Date: ___11/7/03___

David J. MacMain (Atty. ID No. 59320)
L. Kristen Blanchard (Atty. ID No. 80005)
Montgomery, McCracken, Walker & Rhoads, LLP
123 South Broad Street
Philadelphia, PA  19109
215-772-1500

Attorneys for Defendants
County of Lehigh, Thomas Lazorik, Brian Kahler,
Ted Kehm, Janice Nesbit, Jane Baker
and Richard O. Klotz

-47-

957857v1

## CERTIFICATE OF SERVICE

I, L. Kristen Blanchard, attorney for Defendants, hereby certify that on this 7th day of

November, 2003, I caused a true and correct copy of the foregoing **Defendants' Motion for**

**Summary Judgment, Memorandum of Law in Support of same and Defendants' Summary**

**Judgment Exhibits** to be served via First Class, United States mail, postage prepaid, on counsel

for the Plaintiff at the following address:

> Sidney L. Gold, Esquire
> Law Offices of Sidney Gold
> Suite 515, Eleven Penn Center
> 1835 Market Street
> Philadelphia, PA  19103

> *Attorney for Plaintiff,*
> *Timothy Franks*

L. Kristen Blanchard

957857v1