## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TIMOTHY FRANKS, | : | **CIVIL ACTION NO. 02-2652** |
| *Plaintiff,* | : | |
| | : | |
| v. | : | |
| | : | |
| COUNTY OF LEHIGH, | : | |
| THOMAS LAZORIK, | : | |
| BRIAN KAHLER, TED KEHM | : | |
| JANICE E. NESBIT, JANE | : | |
| BAKER, AND RICHARD O. KLOTZ, | : | |
| | : | |
| *Defendants.* | : | |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Presently pending before this Court is Defendants County of Lehigh ("County"),

Thomas Lazorik ("Lazorik"), Brian Kahler ("Kahler"), Ted Kehm ("Kehm"), Janice

Nisbet ("Nisbet"), Jane Baker ("Baker"), and Richard Klotz's ("Klotz") Motion for

Summary Judgment seeking to dismiss the Civil Action filed by Plaintiff, Timothy Franks

("Franks"), pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.  For the

reasons set forth herein below, Defendants' Motion for Summary Judgment must be

denied.

## I.    INTRODUCTION:

By way of background, and in order to enable this Court to better appreciate the

absurdity of the Defendants' contention that Franks was not able to perform the essential

functions of the Accountant I position, it is imperative to preliminarily examine Franks'

work experience.

In 1967 and 1974 respectively, Franks earned a Bachelor of Arts degree in

Economics and a Bachelor of Business Administration in Accounting. (Exhibit "A," p.

10-11). Thereafter, Franks was awarded a Masters of Science degree in Accounting in

1975. (Exhibit "A," p. 11). Franks is also certified in the field of Public Accounting and

has been an active member of the American Institute of Certified Public Accountants

since 1977 (Exhibit "A," p. 11-12). Franks has twenty seven years of work experience in

the field of finance and accounting. See Deposition Transcript of Timothy Franks, p. 11,

attached hereto and marked as Exhibit "A." He has been employed as a financial

manager, a cost accountant, a financial controller, a financial consultant, and as a chief

executive officer. (Exhibit "A," p. 17-21).

Given Franks' stellar academic and professional achievements and his vast and

diverse work experience, the Defendants' contention that he could not perform the

Accountant I job in a satisfactory manner is absolutely incredulous.

In February 1997, Franks was hired by the Defendant County as a Grants

Administrator. See Transcript of Grievance Hearing, p. 8-9, attached hereto and marked

as Exhibit "G." As a Grants Administrator, Franks reported directly to Defendant Kahler,

the County Deputy Fiscal Officer, who was responsible for annually evaluating Franks'

work performance. (Exhibit "G," p. 8, 11-12). After Defendant Kahler completed

Franks' annual performance review, it was then submitted to Defendant Lazorik, the County Fiscal Officer, for approval.  (Exhibit "G," p. 11).

In April of 1998, the Defendant County reassigned Franks to the position of Accountant I.  (Exhibit "G," p. 18-19).  Thereafter, Franks remained in the position of Accountant I until his employment with Defendant County was unlawfully terminated on June 12, 2001.  (Exhibit "G," p. 8).

Franks has legal standing to maintain this action which arises under the Americans with Disabilities Act ("ADA") and the Pennsylvania Human Relations Act ("PHRA") in that Franks suffers from a "disability" or "handicap" as defined by both statutes.  For purposes of summary judgment, the Defendants have conceded this point.

Notwithstanding the fact that the issue of Franks' disability is not at issue, and in order to provide the necessary factual predicate for his claims, we will highlight the significant medical aspects of his condition.

Franks was first diagnosed with Type I Diabetes Mellitus, also known as Juvenile Diabetes, at the age of fifteen.  (Exhibit "A," p. 12-13); See also Letter to Attorney Gold from Robert Doll, Jr., M.D., attached hereto and marked as Exhibit "B."  As a result of his Diabetes, Franks suffers from volatile changes in his glucose, or sugar, levels, on a regular and daily basis such that it is necessary for Franks to manually maintain good glucose control.  (Exhibit "B").  It is necessary for Franks to maintain intensive glucose control to prevent and/or delay the onset of secondary complications, including retinal

disease, kidney disease, and adverse effects on the peripheral nervous system.  (Exhibit "B").  Franks' diabetes is so severe that it became necessary in December of 1999 for Franks to switch from a multi-shot insulin regime to use of an insulin pump.  (Exhibit "A" p. 78).  See also Letter to Janice Nisbet from Robert B. Doll, Jr., M.D., attached hereto and marked as Exhibit "C."

Franks' diabetes and its complications substantially limit a wide variety of major life activities.  As a result, Franks must keep his blood glucose levels within a safe range, which, in and of itself, substantially limits Franks' major life activities of eating and caring for himself.  (Exhibit "B").  On a typical day, upon awakening, Franks must check his glucose level to determine his current state of glucose control, or lack thereof.  (Exhibit "B").  At breakfast, lunch, dinner and at the time of any snack, Franks must check his glucose levels, determine the amount in grams of his anticipated carbohydrate intake, and adjust his insulin pump to deliver an appropriate amount of insulin for each of those meals.  (Exhibit "B").  Franks must always be concerned with the availability of food and the type and quantity of food he chooses to eat.  (Exhibit "B").  Franks must additionally be concerned with physical and psychological stress, which can have a detrimental impact on his blood glucose levels.  (Exhibit "B").

Furthermore, Franks' diabetes has caused short-term complications, including acute hyper- and hypcoglycemia, which can lead to severe episodes, including tremulousness, increased sweating, tachycardia, ultimately resulting in a rapid loss of

consciousness.  (Exhibit "B").

During the course of his employment with Defendant County, from in or about February of 1997 until June 12, 2001, the date of his termination, Franks experienced several episodes of severe, debilitating hypoglycemia attacks due to his diabetes, despite his considerable efforts to avoid them, through frequent glucose monitoring, strict attention to food intake, food timing, and insulin administration.  (Exhibit "B").  It was those episodes or attacks which ultimately caused the County to terminate Franks' employment.  The said attacks provoked the Defendants to treat Franks in a discriminatory manner and fabricate the two unsatisfactory performance evaluations which they advance as the reason for his discharge.

## II.   LEGAL STANDARD:

Summary judgment is only appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  An issue is genuine only if there is sufficient evidentiary basis for which a reasonable jury could find for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  In evaluating a motion for summary judgment, all inferences must be drawn in favor of the non-moving party.  United States v. Diebold, 369 U.S. 654 (1962).

A party seeking summary judgment always bears the initial responsibility of

informing the Court of the basis for the motion and identifying those portions of the

record that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v.

Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986).  Drawing all reasonable

inferences in favor of Franks, the facts clearly demonstrate that there is no basis for the

entry of summary judgment in favor of Defendants.

**III.    SUMMARY OF LAW:**

Franks claims that the Defendants subjected him to disability discrimination in

violation of the Americans with Disabilities Act ("ADA") and the Pennsylvania Human

Relations Act ("PHRA").  The ADA provides in relevant part that "No covered entity

shall discriminate against a qualified individual with a disability because of the disability

of such individual in regard to . . . . discharge of employees, and other terms, conditions,

and privileges of employment."  42 U.S.C. §12112(a).

To make out a prima facie case of disability discrimination under the ADA and

PHRA, Franks must establish that (1) he is disabled within the meaning of the ADA; (2)

he is otherwise qualified to perform the essential functions of the job; and (3) he has

suffered an adverse employment decision due to unlawful disability discrimination.

Shaner v. Synthes, 204 F.3d 494 (3rd Cir. 2000); Kelly v. Drexel University, 94 F.3d 102

(3rd Cir. 1996).

As will be demonstrated herein below, Franks has produced sufficient evidence to

satisfy the requirements of a *prima facie* case under the Americans with Disabilities Act

and Pennsylvania Human Relations Act.

Once the Plaintiff has made out a *prima facie* case, the burden of producing evidence shifts to the Defendants to articulate a legitimate business reason for the termination, *i.e.* two consecutive unsatisfactory performance reviews. In <u>Fuentes v. Perksie</u>, 32 F.3d 759, 764 (3rd Cir. 1994), the Third Circuit Court of Appeals stated that, for a plaintiff to prevail when the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. Courts do not require that a plaintiff adduce evidence directly contradicting the defendant's preferred legitimate reasons. <u>Id</u>.

Therefore, in order to survive summary judgment, Franks must produce sufficient evidence to establish that the said articulated reason is not worthy of belief and is a pretext for discrimination. The summary judgment record and this brief shall conclusively establish that the articulated reason for Franks' termination, the two Unsatisfactory performance reviews, were a sham and were fabricated to mask the Defendants' true discriminatory motive.

As stated hereinabove, the Defendants have conceded, for purposes of summary judgment, that Franks has a disability within the meaning of the ADA and PHRA.

However, in an attempt to defeat Franks' claims, the Defendants attempt to assert that Franks was not qualified to perform the essential functions of the Accountant I position. Specifically, the Defendants assert that Franks' two Unsatisfactory performance evaluations, dated May 18, 2000 and June 11, 2001 established Franks' lack of qualification.

Notwithstanding Defendants' assertion to the contrary, the two Unsatisfactory performance evaluations were fatally flawed and were tainted by discriminatory animus against Franks because of his disability. Moreover, the evaluations were <u>not</u> based on any objective criteria. The Defendants' failure to utilize objective criteria when evaluating Franks' performance enabled them to fabricate the ratings to obtain a desired result, namely, the termination of Franks' employment.

It is well established law that where the employer's proferred reasons are based subjective evaluations, the plaintiff's claim cannot be defeated on summary judgment, since the credibility of the employer's assessment is at issue. <u>Sattar v. Motorola, Inc.</u>, 138 F.3d 1164, 1170 (7th Cir. 1998). <u>See also</u> <u>Iadimarco v. Runyon</u>, 190 F.3d 151, 165-66 (3rd Cir. 1999). The courts have held that when management has broad discretion to apply whatever standards it chooses, the employer's explanations for terminating the plaintiff are likely to mask the real reason for the adverse employment action, namely discrimination. <u>Runyon</u>, 190 F.3d at 166.

As will be demonstrated herein below, the two unsatisfactory evaluations which

Defendants argue formed the predicate basis for the termination, were a pretext for discrimination. The real reason for the termination of Franks' employment was solely because he suffers from severe diabetes and the prejudice and fear it engendered in the Defendants which motivated them to terminate Franks.

**IV.   ARGUMENT:**

    **A.   Defendants' Motion for Summary Judgment Must Be Denied Because Genuine Issues of Material Fact Exist as to Whether Franks' Employment with Defendant County was Terminated Because of his Disability.**

The only issue before the Court is whether or not the Defendants' articulated reason for Franks' termination, namely two consecutive unsatisfactory performance reviews, were a pretext for unlawful disability discrimination. Franks will establish herein below that the two performance reviews at issue were tainted by discriminatory animus towards Franks and were not based on any objective criteria. Thusly, the evaluators were able to transpose their personal fears regarding Franks' disability into the unsatisfactory evaluations. Franks will further demonstrate that the individual Defendants, namely Brian Kahler, Thomas Lazorik, Ted Kehm, Janice Nisbet, Jane Baker, and Richard Klotz, were obsessed and preoccupied with Franks' diabetes and sought to terminate Franks as a result of this fear. Moreover, the summary judgment record will demonstrate that Franks was not in fact an unsatisfactory performer and that the stated reasons for his termination were indeed fabricated.

        **1.   Franks' Two Unsatisfactory Performance Reviews were Fatally**

**Flawed as they Were Not Based on Any Objective Criteria and
Were Actually a Pretext For Unlawful Disability Discrimination**.

Franks received two unsatisfactory annual performance reviews, on May 18, 2000

and June 11, 2001, that form the basis for Defendants' decision to terminate his

employment.  See Letter to Timothy Franks from Richard Klotz dated June 12, 2001,

attached hereto and marked as Exhibit "D;" Performance Review of Timothy Franks

dated May 18, 2000, attached hereto and marked as Exhibit "E;" and Performance

Review of Timothy Franks dated June 11, 2001, attached hereto and marked as Exhibit

"F."

a.    **Franks' May 18, 2000 Performance Review**

On May 18, 2000, Franks was presented his annual performance review by

Defendant Kahler.  Prior to preparing said review, Defendant Kahler discussed the

evaluation with Defendant Kehm, the Supervisor in the Fiscal Office, and Defendant

Lazorik.  (Exhibit "G," p. 27).  Said evaluation was broken down into seven different

categories and Franks was rated in each of the seven categories.  The categories for

evaluation were as follows: (1) Quality of Work, (2) Quantity of Work, (3) Work Habits,

(4) Work Attitudes, (5) Relationship with Others, (6) Personal Qualities, and (8)

Additional Factors.  Additionally, Franks received a rating for his "Overall Work

Performance."  (Exhibit "E").

Attached to the May 18, 2000 evaluation is a document entitled "Basis for

Evaluation," which breaks down the seven evaluation categories into subcategories.

-10-

(Exhibit "E").  The subcategories listed under **Category 1: Quality of Work** are as follows:  Demonstrates satisfactory knowledge of the job; Performs work with acceptable accuracy; Work is neat and presentable; and Is thorough in the work done.  (Exhibit "E"). Franks received a rating of Unsatisfactory based upon the following ratings for his Quality of Work: Satisfactory in Demonstrates knowledge of the job; he was rated Unsatisfactory in Performs work with acceptable accuracy; he was rated Unsatisfactory in Work is neat and presentable; and he was rated Unsatisfactory in Is thorough in the work done.  (Exhibit "E").  Franks received one "S" (Satisfactory) and three "U"s (Unsatisfactory).  (Exhibit "E").

The subcategories listed under **Category 2: Quantity of Work** are as follows: Completes an acceptable amount of work on time; and Does all work assigned.  (Exhibit "E").  Franks received a rating of Satisfactory based upon the following ratings for his Quantity of Work: a rating of Satisfactory in Completes an acceptable amount of work on time; and a rating of Satisfactory in Does all work assigned.  (Exhibit "E").   Franks received two "S"s.  (Exhibit "E").

The subcategories listed under **Category 3: Work Habits** are as follows: Is Regular in attendance at work; Observes established working hours; Carries out tasks in an orderly and diligent manner; Demonstrates the ability to work without immediate supervisor; and Complies with instructions, rules, and regulations, including health and safety precautions.  (Exhibit "E").  Franks received a rating of Unsatisfactory based on

the following ratings for his Work Habits: he was rated Satisfactory in Is regular in

attendance at work; he was rated Unsatisfactory in Observes established working hours;

he was rated Needs Improvement in Carries out tasks in an orderly and diligent manner;

he was rated Satisfactory in Demonstrates the ability to work without an immediate

supervisor; and he was rated Satisfactory in Complies with instructions, rules, and

regulations, including health and safety precautions. (Exhibit "E"). Franks received three

"S"s, one "N" (Needs Improvement"), and one "U," but was nevertheless rated

Unsatisfactory for his Work Habits. (Exhibit "E").

The subcategories listed under **Category 4: Work Attitudes** are as follows:

Endeavors to Improve work techniques; Accepts new ideas and procedures; Accepts

criticism and suggestions; Accepts responsibility willingly; and Demonstrates interest in

work. (Exhibit "E"). Franks received a rating of Satisfactory based on the following

ratings for his Work Attitudes: he was rated Needs Improvement in Endeavors to Improve

work techniques; he was rated Satisfactory in Accepts new ideas and procedures; he was

rated Satisfactory in Accepts criticism and suggestions; he was rated Satisfactory in

Accepts responsibility willingly; and he was rated Satisfactory in Demonstrates interest in

work. (Exhibit "E"). Franks received four "S"s and one "N." (Exhibit "E").

The subcategories listed under **Category 5: Relationship with Others** are as

follows: Gains the respect of co-workers; Helps others willingly; Cooperates with

supervisors and fellow workers; and Observes established channels of communication.

-12-

(Exhibit "E").  Franks received a rating of Satisfactory based on the following ratings for his Relationship with Others: he was rated Satisfactory in Gains the respect of co-workers; he was rated Satisfactory in Helps others willingly; he was rated Satisfactory in Cooperates with supervisors and fellow workers; and he was rated Satisfactory in Observes established channels of communication.  (Exhibit "E").  Franks received four "S"s.  (Exhibit "E").

The subcategories listed under **Category 6: Personal Qualities** are as follows: Acts with good judgment; Demonstrates initiative and drive; Is adaptable to emergencies and new situations; Is careful of appearance - dress and grooming are appropriate; Performs job in a pleasant and considerate manner; and Demonstrates loyalty to organization and co-workers.  (Exhibit "E").  Franks received a rating of Needs Improvement based on the following ratings of his Personal Qualities: he was rated Needs Improvement in Acts with Good Judgment; he was rated Satisfactory in Demonstrates initiative and drive; he was rated Satisfactory in Is adaptable to emergencies and new situations; he was rated Needs improvement in Is careful of appearance - dress and grooming are appropriate; he was rated Satisfactory in Performs job in a pleasant and considerate manner; and Satisfactory in Demonstrates loyalty to organization and co-workers.  (Exhibit "E").  Franks received four "S"s and two "N"s, but curiously received an overall rating of Needs Improvement for his Personal Qualities.  (Exhibit "E").

The subcategories listed under **Category 8: Additional Factors** are as follows:

Confidentiality.  (Exhibit "E").  Franks received a Satisfactory rating in the Additional

Factors category based upon his Satisfactory rating in Confidentiality.  (Exhibit "E").

Despite the fact that Franks received Satisfactory ratings in four of the seven

evaluation categories, Defendants nevertheless gave Franks an overall Unsatisfactory

rating.  (Exhibit "E").  Defendant Kahler attempted to justify Franks' overall

Unsatisfactory rating in stating that there are three core categories that were weighted

heavier than the rest: Quality of Work, Quantity of Work, and Work Habits.  (Exhibit

"G," p. 76-77).  However, Defendant Kahler could not point to a single document

wherein that method of evaluation was set forth.  In fact, Defendant Kahler testified that

there existed no written explanation of the evaluation process.  (Exhibit "G," p. 77).

Defendant Kahler, in a circuitous attempt to justify Franks' overall Unsatisfactory rating,

argued that the fact that Franks received an overall "U" is evidence that the first three

categories were weighted heavier than the rest.  (Exhibit "G," p. 77).  Defendant Kahler

further admitted that Defendant County's Personnel Policies and Procedures booklet does

not mention that the first three categories are to be weighted heavier than the rest.

(Exhibit "G," p. 77).

The rating of Unsatisfactory for Work Habits has no basis in fact and constitute a

total fabrication, was without justification.  Franks was solely rated in this manner

because of Defendants' desire to terminate his employment because of his diabetes.

Defendant Kahler, when questioned as to why Franks received a rating of Unsatisfactory

-14-

for Work Habits when he received three "S"s, one "N," and just one "U," asserted that

Franks' habitual lateness outweighed his higher ratings in the four other subparts.

(Exhibit "G," p. 61).  In sharp contrast, however, Defendant Lazorik, Defendant Kahler's

immediate supervisor and signator on Franks' evaluations, testified during his deposition

that all subcategories should be given equal weight.   See Deposition Transcript of

Thomas J. Lazorik, p. 39, attached hereto and marked as Exhibit "Q."

        Defendant Kahler admitted that there existed no key for the evaluation form that

stated that if an employee received a "U" in that one subpart, he would receive an overall

rating of "U" for Work Habits and further admitted that said rating was subjective.

(Exhibit "G," p. 61).  Defendant Kahler further admitted that he marked Franks as late

even if he arrived just two or three minutes late, which led to the at-issue overall

unsatisfactory rating.  (Exhibit "G," p. 63).  However, the record reflects that whenever

Franks reported to work late, he "would always work through lunch hour or after 4:00."

(Exhibit "A," p. 50; Exhibit "G," p. 67)  Despite Franks' efforts to put in extra hours at

work, Defendant Kahler issued Franks written reprimands forbidding him from working

after 4:00 p.m.  (Exhibit "G," p. 68).

        In order to appreciate the incredulousness of the said performance review, one

must only examine Franks' performance review dated March 4, 1999 for purposes of

comparison.  See Performance Evaluation of Timothy Franks dated March 4, 1999,

attached hereto and marked as Exhibit "U."  In his March 4, 1999 evaluation, Franks

received a Satisfactory rating in the category of Work Habits. (Exhibit "U"). Upon review of the attached Basis for Evaluation sheet, Franks received the following ratings for the Work Habits subcategories: he was rated Satisfactory in Is regular in attendance at work; he was rated Unsatisfactory in Observes established working hours; he was rated Needs Improvement in Carries out tasks in an orderly and diligent manner; he was rated Satisfactory in Demonstrates the ability to work without immediate supervisor; and he was rated Satisfactory in Complies with instructions, rules, and regulations, including health and safety precautions. (Exhibit "U"). The aforesaid Work Habits subcategory ratings were identical to the ratings received by Franks in his May 18, 2000 and June 11, 2001 performance reviews. Nevertheless, the identical three "S"s, one "N," and one "U," added up to an overall Satisfactory rating in 1999. However, the same three "S"'s, one "N," and one "U," all resulted in an overall Unsatisfactory in 2000 and 2001. This provides clear evidence of Defendants' ill motive when evaluating his work performance in May of 2000 and June of 2001, and renders the evaluation not worthy of any credibility.

Although Defendant Kahler stated that Franks' lateness was a matter of serious concern, he never once followed the office's progressive discipline procedure and never issued Franks a formal letter of warning for his lateness. See Deposition Transcript of Brian Kahler, p. 36, attached hereto and marked as Exhibit "H." Defendant Klotz testified that "there is no line of demarcation . . . where five latenesses triggers a warning

or ten latenesses triggers a warning" and that the decision whether to discipline or not is left up to the individual offices, in this case Defendant Kahler.  See Deposition Transcript of Richard Klotz, p. 40, attached hereto and marked as Exhibit "I."  Significantly, despite the fact that Franks was late on a number of occasions, it did not affect his ability to "complete[s] an acceptable amount of work on time," as noted by a rating of "S" by Defendant Kahler on Franks' May 18, 2000 performance review.  (Exhibit "E").

In contradiction to the Defendants' articulated position, Defendant County presented Franks with an "Attendance Award" for "excellent attendance and dedication to the County of Lehigh in January of 2001."  See Attendance Award, attached hereto and marked as Exhibit "AA."  Therefore, the inescapable conclusion is that "lateness" could not have possibly been as grave an issue as articulated by Defendants inasmuch as he received said Attendance Award and was granted "4 additional reward personal days" as a result of receipt of said Award.  (Exhibit "AA").

In addition to the Unsatisfactory rating regarding his Work Habits, Franks also takes issue with the Needs Improvement rating regarding his Personal Qualities and it too was without justification.  During the grievance hearing, Defendant Kahler testified that Franks received the overall "N" rating because of the "N" rating for subcategory, Acts with Good Judgment.  (Exhibit "G," p. 82).  When asked to expound on his rationale, Defendant Kahler articulated that it was based on one incident when he heard that Franks ran his fingers through icing on a cake.  (Exhibit "G," p. 83).  In further support of the

-17-

"N" rating, Defendant Kahler allegedly saw Franks "swigging" milk out of a community

milk jug. (Exhibit "G," p. 84). Franks adamantly denied this accusation and testified that

he brought his own jug of milk to work every week for health reasons. (Exhibit "G," p.

142). Additionally, Defendant Kahler took serious offense when Franks trailed water

through the office from his water jug despite the fact that Franks cleaned up said spill.

(Exhibit "G," p. 85, 143). For these three reasons, Defendant Kahler gave Franks a

Needs Improvement rating for the entire category of Personal Qualities, notwithstanding

the fact that Franks received Satisfactory ratings in four out of the five remaining

categories. (Exhibit "G," p. 86). This further demonstrates the absurdity of the

Defendants' rating system.

Defendant Kahler further testified that had Franks received an "S" in each

subcategory, he would have received an overall "S" for Personal Qualities. (Exhibit "G,"

p. 87). However, this same rationale did not apply, according to Defendant Kahler, to the

Work Attitudes category where Franks received an overall "S" rating despite the fact that

he did not receive an "S" rating in each and every subcategory. (Exhibit "G," p. 87).

### b.    Franks' June 11, 2001 Performance Review

On June 11, 2001, Defendants presented Franks with a second consecutive overall

Unsatisfactory performance review. Identical to the previous review, this review was

again broken down into the same seven categories: (1) Quality of Work, (2) Quantity of

Work, (3) Work Habits, (4) Work Attitudes, (5) Relationship with Others, (6) Personal

Qualities, and (8) Additional Factors.  (Exhibit "F").  Again, attached to the performance review is a document entitled "Basis for Evaluation" which breaks down the seven evaluation categories into subcategories.  (Exhibit "F").  Franks received identical ratings to those described in detail herein above.  (Exhibit "F").  Despite the fact that Franks was rated as Satisfactory in four of the seven categories, Defendants Kahler, Kehm, and Lazorik nonetheless rating his Overall Work Performance as Unsatisfactory.  (Exhibit "F").

Also attached to Franks' June 11, 2001 performance review was a memorandum to Franks from Defendants Lazorik, Kahler, and Kehm.  (Exhibit "F").  In said memo, Defendants note that Franks had improved with regard to his neatness and legibility under Quality of Work, but nonetheless rated him as Unsatisfactory in the subcategory entitled Work is neat and presentable.  (Exhibit "F").  Defendant Kahler, when questioned, testified that Franks' work "went from no structure to some structure."  (Exhibit "G," p. 92).

In fact, in a Performance Evaluation Follow-up report dated October 4, 2000, Defendants Lazorik, Kahler, and Kehm noted to Franks that since his last evaluation in May of 2000, he had demonstrated improvement in his Quality of Work, namely in maintaining neat, legible work papers, in maintaining proper documentation of events and meetings of grant progression, in properly designing excel spreadsheets, and in completing grant documents subject to accounting policies and County procedures.  See

-19-

Performance Evaluation Follow-Up dated October 4, 2000, attached hereto and marked as

Exhibit "BB."   Defendants Lazorik, Kahler, and Kehm further specified that Franks had

demonstrated improvement in his Quantity of Work, specifically in his ability to finalize

grant projects assigned through team meetings.  (Exhibit "BB").  Moreover, in October of

2000, Defendants noted that Franks had demonstrated improvement in his Work Habits,

namely his ability to maintain need, organized files on grant projects, and his ability to

process requests from offices in a timely manner.  (Exhibit "BB").

Despite these accolades in the areas of Quality of Work, Quantity of Work, and

Work Habits, Franks still received Unsatisfactory ratings for his Quality of Work and

Work Habits in his June 11, 2001 performance review.  (Exhibit "F").  Defendant Kahler

testified that the purpose for said Performance Evaluation Follow-Up was to provide

continued guidance to Franks and to assist Franks in improving his alleged deficiencies.

(Exhibit "G," p. 32).  Curiously, if the intended purpose was to truly assist Franks, why

then did the Defendants neglect to note that it was necessary for Franks to demonstrate

even further improvement in these areas or run the risk of receiving Unsatisfactory ratings

in his next annual review?

Thus, upon careful review of Franks' May 18, 2000 performance review and his

June 11, 2001 performance review, and the explanation and/or justification for said

ratings espoused by the Defendants, it is readily apparent that Defendants manipulated

Franks' ratings in order to get their desired outcome, an overall Unsatisfactory rating, in

an attempt to force Defendant County to terminate Franks' employment.

As will be demonstrated herein below, Franks' evaluations were tainted by the discriminatory animus of the Defendants toward Franks because of his diabetic condition. Accordingly, the summary judgment record clearly demonstrates that issues of fact exist regarding the true underlying bases for Franks' evaluations such that the Court should deny the Defendants' Motion for Summary Judgment.

> **2.    Defendants were Obsessed and Preoccupied with Franks' Diabetes and Sought to Terminate His Employment as a Result of Their Fear.**

The record clearly demonstrates that the Defendants were obsessed and preoccupied with Franks' diabetes such that one can conclude that they sought to terminate his employment as a result of their fear.   Franks' supervisors, including Defendants Kahler, Kehm, Lazorik, and Klotz, as well as Defendant Nisbet, HR Representative, frantically documented countless diabetic "episodes and attacks" of Franks that occurred in the workplace, and circulated said documentation amongst themselves without any justification.

> **a.    The Actions of Brian Kahler**

Throughout Franks' employment with Defendant County, Defendant Kahler generated a series of detailed reports of Franks' diabetic incidents.  (Exhibit "H," p. 13). Defendant Nisbet instructed Defendant Kahler to document said incidents and to provide her with documentation of any incidents that occurred prior to her arrival in the HR

Department.  (Exhibit "H," p. 13).  As part of Defendant Kahler's procedure, he always sent copies of these incidents to Defendants Lazorik, Kehm, and Klotz.  (Exhibit "H," p. 16).  Defendant Kahler reasoned that it was necessary to inform these individuals because they "were all supervisors right within the office."  (Exhibit "H," p. 16).  Defendant Kahler further articulated that he was adhering to some standard operating procedure when he sent this information to others in the office.  (Exhibit "H," p. 17).  In addition, Defendant Kahler maintained a "booklet," a small binder, on Franks which contained all circulated emails and other paperwork regarding his diabetic condition, documentation regarding Franks' latenesses and performance evaluations, and documents submitted to Defendant County by Franks' physician.  (Exhibit "H," p. 29).

On or about July 9, 1999, Defendant Kahler prepared a document entitled "Tim Franks Incident 7/9/99" wherein he set forth a time line regarding a diabetic episode of Franks.  See Tim Franks Incident 7/9/99, attached hereto and marked as Exhibit "J." Defendant Kahler diligently noted the following details:

- 9:35      Jan Link notified me Tim was making strange noises

- 9:35      Tim is approached and is having difficulties

- 9:40      Tim agrees to take a glucose tablet

- 9:45      Rick Klotz notified of incident

- 9:50      Tim agrees to drink juice
  Tim appears to have pain and is confused
  Tim has extreme difficulty sitting in a chair

-22-

- 9:55     Tim agrees to eat a granola bar
           Tim appears to be coming out

- 10:00    Paramedics arrive
           Tim is getting better

- 10:15    Paramedics deem he is under control and leave
           Repeated calls to reach his wife by TJ at Air Products are
           Unsuccessful

- 10:25    Air Products finally tracks down Mrs. Franks who speaks
           with TJ. (Exhibit "J").

On October 28, 1999, Defendant Kahler drafted a document entitled "Tim Franks

Documentation" and circulated it in an email attachment to Defendants Nisbet, Klotz,

Kahler, and Kehm. See Tim Franks Documentation dated October 28, 1999, attached

hereto and marked as Exhibit "K." Again, Defendant Kahler prepared a blow by blow

account of another of Franks' diabetic attacks. Defendant Kahler stated as follows:

> I immediately checked on Tim and found him sitting in his chair. I asked
> him a few questions and he had a difficult time understanding me. I
> suggested to him that he remain in his chair and requested for Ted to call
> for medical assistance.
>
> I returned to my office when Ted approached me regarding Tim. He said
> that Tim was walking out of the Office. We immediately left my office and
> made a request of Tim to come to my office and have a seat. He did so but
> appeared confused.
>
> An Allentown Police Officer arrived in a few minutes, followed by Para
> Medics and a Deputy sheriff.
>
> The Para Medics provided assistance to Tim and requested that he should
> eat when they left at approximately 11:25 a.m.
>
> I tried to contact Janice Nesbit in Human Resources regarding the incident.

-23-

> She was unavailable so I left a voice mail for her.

> I called Carmen and left a message for her to tell Rick Klotz about the incident.  (Exhibit "K").

On February 8, 2001, in a blatant attempt to penalize and keep Franks out of work because of his diabetes, Defendant Kahler sends an email to Defendants Nisbet, Klotz, and Kehm.  See Email from Kahler to Nisbet, Klotz, and Kehm dated February 8, 2001, attached hereto and marked as Exhibit "L."  Defendant Kahler writes, "Should he be required to get clearance, he has had three of these in office incidents just recently.  Please advise."  (Exhibit "L").

Subsequently, on the morning of February 12, 2001, Defendant Kahler circulated an email to Defendants Klotz, Kehm, and Lazorik, curiously excluding Defendant Nisbet from HR, stating, "We need to address this, it is becoming a regular event recently."  See Email from Kahler to Klotz, Kehm, Lazorik dated February 12, 2001, attached hereto and marked as Exhibit "M."  This email was sent in reply to an email from Defendant Kehm describing a diabetic incident of Franks that had occurred earlier that week.  (Exhibit "M").

Later that very same day, Defendant Kahler circulated another email to Defendants Nisbet, Klotz, Kehm, and Lazorik with the subject "Tim Franks Incident 2/12/01," documenting minute by minute, Franks' behavior.  See Email from Kahler to Nisbet, Klotz, Kehm, Lazorik, attached hereto and marked as Exhibit "N."  This email documented the following:

- 3:30    I was notified Tim was having problems.  Checked with Tim, appeared confused but insisted he was OK.

- 3:35    Checked on Tim again, he appears confused and I suggest he drink a Pepsi.  Tim insists he is OK.  I pour a Pepsi for him and ask him to drink.  Tim refuses.

- 3:40    Check with Rick and Janice who suggest to contact 911.

- 3:45    Sheriff notified by Ted and 911 requested.

- 3:50    Paramedics (2), Police (2), Sheriff arrive on scene.  Tim will not remove his jacket and argues with the Paramedics. Paramedics pull his jacket over his head and begin procedures.  Count is stated as 24 and treatment begins.  Tim responds.

- 4:00    Tim argues with the paramedics over the need to go to the hospital and not to drive home.

- 4:05    Ted and I depart for the day.  (Exhibit "N").

Significantly, the following day, February 13, 2001, Defendant Kahler circulated an email to Defendants Nisbet, Klotz, Kehm, and Lazorik, explaining that as a result of Franks working with diabetes, he had grave fears regarding his personal liability.  See Email from Kahler to Nisbet, Klotz, Kehm, Lazorik dated February 13, 2001, attached hereto and marked as Exhibit "O."  Defendant Kahler wrote, "Concern: Tim makes the statement alluding to the fact that soda may not be the correct solution.  **Should we offer soda or revert to the 7/13/99 memo which states untrained employees should not provide medical clearance?**  Also, I am becoming more and more concerned about my personal liability.  **I respectfully request a legal opinion as to what are my**

**responsibilities and liability personally and as an employee in this on-going situation.**
I feel uncomfortable with these recurring events and the impact it has on my own day to day performance. Please advise." (Exhibit "O").

During his deposition, Defendant Kahler expounded that he was concerned that "someone could say I didn't do everything I could have possibly done, and that was my fear." (Exhibit "H," p. 48). Defendant Kahler additionally admitted that he feared he could be liable if Franks was injured or died on the job. (Exhibit "H," p. 49). Defendant Kahler further testified that after Franks suffers an episode, "I am unable to get back to work after the incident then, because I feel uncomfortable because I am unable to solve the incident." (Exhibit "H," p. 50). Defendant Kahler admitted that these incidents with Franks left him "shook up" and admitted that "It is not something you want to see." (Exhibit "H," p. 50). Defendant Kahler also noted that Franks' incidents were "a disruption." (Exhibit "H," p. 51-52).

On March 2, 2001, Defendant Kahler circulated yet another account of a diabetic incident of Franks to Defendants Klotz, Nisbet, Kehm, and Lazorik. Defendant Kahler titled this email "Incident #19." See Email from Kahler to Klotz, Nisbet, Kehm, and Lazorik dated March 2, 2001, attached hereto and marked as Exhibit "P." Defendant Klotz again provided a minute by minute account of Franks' behavior as follows:

- 3:15        Ted is notified Tim appears to be having problems. Ted speaks with Tim who appears to be confused, 911 is requested.

- 3:25        Deputy Sheriff and paramedics arrive.

-26-

> Tim is confused, resistant to treatment, moaning and groaning loudly. Paramedics have extreme difficulty administering treatment, Tim continues to moan and groan.

- 3:35    Rick is notified there is another incident occurring.

- 3:40    I return to the Office, Tim is moaning and groaning and the difficulty in administering treatment continues. The office environment has become so stressful and non-conducive to performing the essential functions of the Fiscal Office, I instruct all Fiscal (4th floor) employees to leave immediately.

- 3:45    Rick is re-notified and comes down to the Office with Janice.

- 4:00    Paramedics and Sheriff still present, I depart for the day.

**On February 13, 2001, I respectfully requested a legal opinion as to what are my responsibilities and liability personally and as an employee in this on-going situation. I have not received a written response as of this date, at is the current status of this request?**

I continue to feel uncomfortable with these recurring events (19 incidents) and the impact it has on my own day to day performance. (Exhibit "P").

### b.    The Actions of Thomas J. Lazorik

At all times relevant to this action, Defendant Lazorik was the Fiscal Officer for Defendant County and was Defendant Kahler's immediate supervisor. (Exhibit "Q," p. 3)

Every time Franks suffered a diabetic episode, either Defendant Kahler, Kehm, or Klotz emailed notification to Defendant Lazorik. (Exhibit "Q," p. 5).

On April 21, 1997, soon after Franks became employed with Defendant County, Defendant Lazorik sent a memorandum titled "Employee Health Concerns" to Charles Dorn, Personnel Director confirming a recent conversation wherein he expressed his

-27-

concerns regarding Franks' health.  See Employee Health Concerns Memorandum dated

April 21, 1997, attached hereto and marked as Exhibit "R."  Defendant Lazorik further

wrote, "I believe that you were going to coordinate an action plan for use by the Fiscal

office.  Subsequent to our discussion, I received an incident report dated March 25, 1997 on

April 1, 1997 from Richard O. Klotz concerning Mr. Franks . . . Could we please meet to

once again discuss my previous concerns about what actions should be taken by my staff or

myself involving Mr. Franks' health issues."  (Exhibit "R").

       One month later, after becoming aware that Franks had on "at least three separate

occasions . . . appeared detached, confused, and unaware" and after becoming aware that

emergency medics had already been called for Franks on two occasions, on May 30, 1997,

Defendant Lazorik sent a letter to Franks expressing concern regarding his "health and

well-being" and the impact of his health on his "ability to perform the essential functions of

[his] job."  See Letter from Lazorik to Franks dated May 30, 1997, attached hereto and

marked as Exhibit "S."   Defendant Lazorik's letter required that Franks' physician respond

to certain questions in writing and additionally required that Franks execute an

authorization to release his medical records to Defendant County.  (Exhibit "S").  It is

readily apparent that Defendant Lazorik was fearful of Franks' medical condition and sent

this letter in an effort to force Franks out of the workplace.  Defendant Lazorik testified that

after contacting Defendant County's personnel office, he was instructed to send this letter

to Franks.  (Exhibit "Q," p. 11).  Defendant Lazorik further testified that other disabled

-28-

employees were not given similar letters to present to their physicians, just Franks, and that

other disabled employees were not subjected to surveillance like Franks (Exhibit "Q," p.

12).

On June 9, 1999, Defendant Lazorik prepared "Documentation 6-9-99" regarding

Franks' diabetic condition.  See Documentation 6-9-99, attached hereto and marked as

Exhibit "T."  Defendant Lazorik, as if in a frenzy, documented a minute by minute account

of Franks' behavior and activities as follows:

- 10:30     Approached by Ted about Tim Franks having a problem.
            Spoke to Tim, Clearly was starting to have a problem.
            Checked Tim's chart that he uses to monitor condition.  No
            entry for 10:00 A.M. today.

- 10:35     Was able to have Tim sit in his chair and take 2 tablets, and
            drink orange drink.

- 10:40     Asked Tim if he monitored himself today.  Yes, 52 just before
            10:00.  He ate Lebanon Bologna and cream cheese.

- 10:45     Responded better after the consumption of above referenced
            items.

- 10:50     Asked Tim questions about pictures.  He recognized and
            responded well.

- 10:55     Tim went to the bathroom.

- 11:00     Asked Tim to retest himself when he got back.  He did, 98 was
            the test result.

- 11:05     Called Joann Franks.

- 11:25     Received return call from JoAnn.  Explained event to her.  She
            said that she was buying an insulin gun.  I told her that I wasn't

-29-

comfortable with this idea.  She said ok.

- 11:30    Tim was back to himself working.  Said that he had a sandwich
          for lunch.

- 12:10    Told Tim to go to lunch.  (Exhibit "T").

After drafting this document, Defendant Lazorik placed it in a file he maintained on Franks,

which included all emails he received from coworkers regarding Franks' nineteen or twenty

diabetic episodes.  (Exhibit "Q," p. 17).

### c.    The Actions of Ted Kehm

Defendant Kehm was the Fiscal Office Supervisor during the course of Franks'

employment with Defendant County and at the time of Franks' termination.  See

Deposition Transcript of Ted Kehm, p. 3, attached hereto and marked as Exhibit "V."

During this period in time, Defendant Kehm indirectly supervised Franks and ultimately

signed off on Franks' performance reviews.  (Exhibit "V," p. 5, 7).

Defendant Kehm became aware of Franks' diabetes within two weeks after Franks

was hired.  (Exhibit "V," p. 9).  Franks suffered a diabetic episode while he was still in his

preliminary training phase.  (Exhibit "V," p. 11-12).  Moreover, Defendant Kehm had a

number of conversations regarding Franks' diabetes with Franks' immediate supervisor,

Defendant Kahler.  (Exhibit "V," p. 13).  Defendant Kehm was also well aware that Franks

made a transition from insulin injections to an insulin pump and that during this transition

period, Franks was going to experience some complications.  (Exhibit "V," p. 19).  Franks

had also made Defendant Kehm aware of the severity of his diabetes and told Defendant

-30-

Kehm that he could die from said medical condition.  (Exhibit "V," p. 24).

Similar to Defendants Kahler and Lazorik, Defendant Kehm also generated documentation regarding Franks' diabetic episodes and forwarded said documentation to other supervisors in the department.  (Exhibit "V," p. 36).  Defendant Kehm testified that noone instructed him to keep such documentation, nevertheless Defendant Kehm admitted to having "followed what everybody else was doing."  (Exhibit "V," p. 37).

In connection thereto, on April 13, 2000, Defendant Kehm created documentation regarding a diabetic episode of Franks and forwarded the information in an email to Defendants Nisbet, Klotz, Lazorik, and Kahler.  See Email from Kehm to Nisbet, Klotz, Lazorik, and Kahler dated April 13, 2000, attached hereto and marked as Exhibit "W." Defendant Kehm titled this email "4-12-00 Tim Franks Incident."  (Exhibit "W"). Defendant Kehm documented a minute by minute account of Franks' diabetic incident as follows:

- 3:50 - 3:55   Informed by George Samuelson that Tim was having another incident.  I confirmed and called 7911.  I got the answering machine when I attempted to contact the Gov't center deputies on their cell phone; therefore, I called Loretta in the Sheriff's office who informed the deputy of the situation.

- 3:55 - 4:00   1 Allentown police officer, 2 Paramedics, and 1 Sheriff Deputy arrive.

- 4:10   I left the office.  (Exhibit "W").

On February 8, 2001, Defendant Kehm sent an improper email to Defendants Nisbet, Klotz, Kahler, and Lazorik entitled "Tim Franks 2/8/01 Incident," describing

a similar diabetic incident.  <u>See</u> Email from Kehm to Nisbet, Klotz, Kahler, and Lazorik dated February 8, 2001, attached hereto and marked as Exhibit "Z."  Defendant Kehm's email stated the following:

- 2:50    I noticed Tim in his cubicle making out-of-the-ordinary body movements that have been typical of him having an incident.  I asked him how he felt.  His confused manner and slurred speech confirmed that he needed assistance.

    I opened a bottle of Pepsi, poured it in a cup, and suggested to Tim that he drink the soda.  He complied.  After he finished the soda, he appeared better, but not normal.  He opened a 4-pack of Reese's and ate two of them.

- 3:10    Tim *appears* to have returned to normal.  (Exhibit "Z").

On February 9, 2001, Defendant Kehm documented another diabetic episode of Franks in an email entitled "Tim Franks 2/9/01 Incident" that was sent to Defendants Nisbet, Klotz, Kahler, and Lazorik.  <u>See</u> Email from Kehm to Nisbet, Klotz, Kahler, and Lazorik dated February 9, 2001, attached hereto and marked as Exhibit "X."  Defendant Kehm disseminated the following information:

- 3:05    I noticed Tim in his cubicle making out-of-the-ordinary body movements that have been typical of him having an incident.  I asked him how he felt.  His confused manner and slurred speech confirmed that he needed assistance.  He stated that he just tested his blood sugar level and that he was fine.  When he attempted to show me, I pointed out to him that the blood sample was inserted backwards (the part with the blood on it was sticking out of the tester).

    He asked him to drink soda.  He indicated that he didn't want soda and proceeded to eat a donut.  The donut did not remedy the situation and I once again requested him to drink soda.  He

-32-

complied and drank 16 oz. of Pepsi.

- 3:25    Tim *appears* to have returned to normal. (Exhibit "X").

Similarly, on May 25, 2001, Defendant Kehm circulated another improper email to Defendants Nisbet, Klotz, Kahler, and Lazorik entitled "Tim Franks Incident - 5/25/01." See Email from Kehm to Nisbet, Klotz, Kahler, and Lazorik dated May 25, 2001, attached hereto and marked as Exhibit "Y." Defendant Kehm recounted the following:

- 11:45    I was informed by Maria Rotondo that Tim was having an incident. I went to Tim's cubicle and observed that he was making out-of-the-ordinary body/head movements that have been typical of him having an incident. I asked him how he felt. His confused manner and slurred speech confirmed that he needed assistance (he kept explaining about "expenses over a period of time" while referencing a blank excel spreadsheet on the computer).

    I placed his glucose tablets and bottle of soda in front of him and explained to him at least three times that it appeared to me that his sugar levels were dangerously low and that he needed to take a tablet and/or drink soda. He did not.

- 11:55    I called 7911 and sheriff deputy.

- 12:00    Sheriff deputy and one Allentown policeman arrive.

- 12:05    Paramedics arrive and begin to administer aid.

- 12:15    Tim *appears* to have returned to normal and acknowledges to them he did not monitor his sugar levels properly this morning. Paramedics receive clearance from a doctor as Tim refuses transport to hospital.

- 12:20    Paramedics, policeman, and deputy leave. Tim leaves as well. (Exhibit "Y").

-33-

As one can readily see from Defendant Kehm's aforesaid emails, Defendant Kehm was somewhat fixated on Franks' diabetic episodes. In fact, during his deposition, he testified that, like Defendant Kahler, he had concern as to what his own personal liability and legal exposure might be if he either gave Franks inappropriate treatment during a diabetic attack or if he neglected to aid Franks during a diabetic attack. (Exhibit "V," p. 44). Accordingly, Franks asserts that Defendants' fear of individual liability acted as an incentive to terminate Franks' employment with Defendant County.

### d.    The Actions of Richard Klotz

Defendant Klotz held the position of Director of Administration for Defendant County during Franks' employment and at the time of his termination. (Exhibit "I," p. 5). As Director of Administration, Defendant Klotz had the power, and was directly involved in the decision, to terminate Franks' employment. (Exhibit "I," p. 5). Defendant Klotz testified that it was his duty to check the documentation that supports an employee's termination to make sure it is correct prior to an employee actually being terminated. (Exhibit "I," p. 8). Defendant Klotz further testified that the only documents he recalled having reviewed prior to signing off on Franks' termination were the two Unsatisfactory performance reviews. (Exhibit "I," p. 9, 12-13). Furthermore, Defendant Klotz acknowledged that prior to signing off on Franks' termination and after Franks had filed a grievance challenging his termination, he did absolutely nothing to determine whether Defendant Kahler's two evaluations of Franks were based on prejudice because of Franks'

disability.  (Exhibit "I," p. 59).

The record further reveals that Defendant Klotz confirmed the fact that Defendants Kahler and Lazorik had grave concerns as to whether their conduct, in tending to Franks' numerous workplace diabetic episodes, "was legal or not."  (Exhibit "I," p. 31, 52). Defendant Klotz testified that "they were concerned about any legal liability that they had regarding helping Tim when they felt that he was going into some type of a low sugar . . . and I did direct them to check with the law department."  (Exhibit "I," p. 51).  Defendant Klotz also admitted that he believed that the instances when Franks had to be taken to the hospital were "a form of disruption in the office setting."  (Exhibit "I," p. 44).

Defendant Klotz, like the others, kept detailed documentation regarding Franks and his diabetic condition.  By way of example, on April 1, 1997, soon after Franks was hired, Defendant Klotz prepared a Memorandum to the File stating that Franks had "seemed confused" and was acting in a "bazaar" (sic.) manner.  See Memorandum to File dated April 1, 1997, attached hereto and marked as Exhibit "CC."  It is additionally significant to note that Defendant Klotz, the individual who ultimately decided to terminate Franks, was carbon copied on countless emails detailing Franks' diabetic condition and incidents. (Exhibit "I," p. 60).

Thus, one can reasonably conclude that since Defendant Klotz saw no hard documentation of Franks' alleged performance deficiencies, aside from the bogus evaluations themselves, he acquiesced in the other Defendants' discriminatory treatment

toward Franks in agreeing to terminate Franks' employment.

### e.    The Actions of Jane Baker

Defendant Baker held the position of County Executive at the time Franks commenced employment with Defendant County until in or about the year 2000. See Deposition Transcript of Jane Baker, p. 4, attached hereto and marked as Exhibit "DD."

Defendant Baker testified that she refused to allow Defendants Kahler and Lazorik to terminate Franks so long as she remained employed with the County. (Exhibit "DD, p. 37). Significantly, immediately after Defendant Baker left her employment with Defendant County, Franks began to receive Unsatisfactory performance reviews in a clear effort to terminate Franks because of his diabetes.

On numerous occasions during the course of Franks' employment, Defendant Baker received notifications from both Defendants Kahler and Lazorik that Franks had suffered a diabetic "episode." (Exhibit "DD," p. 23). In fact, Defendant Kahler approached Defendant Baker to discuss their concerns that Franks was having "episodes" at work. (Exhibit "DD," p. 24). Defendants Kahler and Lazorik even discussed with Defendant Baker the fact that they were concerned about the "legal aspects" surrounding Franks having diabetic episodes in the workplace. (Exhibit "DD," p. 47-48).

Defendant Nisbet additionally approached Defendant Baker to address her concerns regarding Franks' diabetic condition and his having diabetic incidents in the workplace.

(Exhibit "DD," p. 29). Defendant Baker testified "it was my concern that he would hurt himself or someone else." (Exhibit "DD," p. 35). However, Defendant Baker was never presented with any medical documentation stating that Franks was ever a danger to either himself or to others because of his diabetes. Thus, because Franks' medical condition was discussed in such detail throughout the workplace on almost a daily basis, individuals, including Defendant Baker, perceived Franks to be a threat to himself and others.

### f.      The Actions of Janice Nisbet

Defendant Nisbet was employed with Defendant County as the Human Resources Director until August 13, 2001. See Deposition Transcript of Janice Nisbet, p. 5, attached hereto and marked as Exhibit "EE." During the course of her employment as Human Resources Director, Defendant Nisbet received countless improper emails from Defendants Kahler, Klotz, Lazorik, and Kehm regarding Franks' medical condition and their fears and concerns regarding personal liability. (Exhibits "J," "K," "L," "O," "P," "W," "X," "Y," and "Z"). Yet, Defendant Nisbet oddly testified that she had no idea Defendant Kahler was documenting Franks' diabetic incidents. (Exhibit "EE," p. 33).

Defendant Nisbet additionally expressed concerns that Franks' diabetic incidents were causing "disruption" in the workplace, which she documented in an email to Defendant Klotz. See Email from Nisbet to Klotz titled "Timothy Franks" dated July 20, 1999, attached hereto and marked as Exhibit "HH." Defendant Nisbet documented that she counseled Franks and told him that her goal was to have a "non-disruptive workplace" and

that Franks agreed to do as much as possible to maintain his sugar to keep his diabetes under control.  (Exhibit "HH").  Defendant Nisbet further stated in her email to Defendant Klotz, "If you wish, I will communicate this information to TJ as well as extending the general assistance of our office to help TJ in maintaining a non-disruptive work place." (Exhibit "HH").

It is undisputed that Franks transitioned from injecting insulin to use of a pump mechanism.  At or about the time of this transition and as a result of an incident due to the adjustment to the new mechanism, on January 6, 2000, Defendant Nisbet sent a letter to Franks putting him out of work until his physician provided documentation that assures that Franks knew how to properly use the pump and administer the medication, and that Franks was following the correct procedures for self-maintenance to control his sugar level.  See Letter from Nisbet to Franks dated January 6, 2000, attached hereto and marked as Exhibit "FF."   Defendant Nisbet's letter to Franks further stated that she was "concerned that the current incident In occurred and that there is a possibility of future incidents."  (Exhibit "FF").  Defendant Nisbet sent a carbon copy of this letter to Defendant Kahler, Franks' immediate supervisor, insinuating that she believed Franks' misuse of the pump was causing his diabetic episodes.

In connection thereto, Franks' physician sent a letter to Defendant Nisbet informing her that Franks understands the use of the pump and that his recent diabetic episodes had nothing to do with his transition to the pump and were essentially a side-effect of his actual

condition.  See Letter from Dr. Doll to Nisbet dated January 7, 2000, attached hereto and marked as Exhibit "GG."

In sum, Defendant Nisbet permitted Franks' supervisors to circulate unlawful documentation regarding Franks' diabetes.  Defendant Nisbet, aware that Franks' supervisors were fearful of personal liability, took no action to alleviate said fears, essentially allowing their imaginations to run wild as to what might legally happen to them if Franks is injured on their guard.  Furthermore, Defendant Nisbet, aware of said fears, still permitted Defendants Kahler, Kehm, Lazorik, and Klotz to evaluate Franks' job performance, never thinking that they may not be able to conduct said evaluations in an impartial manner.

> **3.    Contrary to the Defendants' Contentions, George Samuelson, an Impartial Evaluator, Deemed Franks' Work to Be Satisfactory.**

Contrary to the Defendants' contentions, George Samuelson, an impartial evaluator, deemed Franks' work performance to be satisfactory.  Samuelson has been employed by Defendant County since October of 1998.  See Deposition Transcript of George Samuelson, p. 11, attached hereto and marked as Exhibit "II."  During the course of Franks' employment, Samuelson held the position of Grants Administrator.  (Exhibit "II," p. 11).  As part of his duties as Grants Administrator, Samuelson had the opportunity to oversee and review Franks' work product for a period of approximately two and one half years.  (Exhibit "II," p. 12, 19).  Samuelson reviewed most grant reports that were prepared by Franks before they were submitted externally to Harrisburg.  (Exhibit II, p. 12).

Samuelson testified that neither Defendant Kahler, Kehm, or Lazorik ever expressed dissatisfaction with Franks' work in his presence, nor did Samuelson ever report to the Defendants that Franks' work was unsatisfactory. (Exhibit "II," p. 18). Samuelson further testified that based on his review of Franks' work, he would have never recommended that Franks be terminated based on his work performance. (Exhibit "II," p. 22). When asked what complaints he ever had with Franks' work, Samuelson replied that sometimes he would find a stray pen or pencil mark on the inside cover of a folder, or legal-sized paper sticking out of a file that was longer than the actual grant file. (Exhibit "II, p. 25).

During his deposition, Samuelson could not recount a single instance where Franks was reprimanded for neatness. (Exhibit "II," p. 26). Samuelson additionally testified that Franks had no difficulty in completing grant documents. (Exhibit "II," p. 29). Defendant Kahler frequently sent emails jointly to Franks and Samuelson regarding particular grant forms. Said emails never contained any criticisms that Samuelson believed warranted Franks' termination. (Exhibit "II," p. 34). Samuelson stated, "I don't remember seeing anything in the emails that I thought was major enough that couldn't be fixed, that if it wasn't fixed it would result in Tim's firing." (Exhibit "II," p. 34). Samuelson further testified that he never thought Franks had problems retaining knowledge of the county accounting system, one of the performance evaluation categories where Defendants' rating Franks as Unsatisfactory. (Exhibit "II, p. 36). Samuelson further testified that Franks was highly knowledgeable with regard to the grants that were administered by Defendant

-40-

County.  (Exhibit "II," p. 69).

Samuelson could not recall a single instance where a grant was lost or put in jeopardy because of any mistake made by Franks.  (Exhibit "II," p. 40).  Nor did Samuelson ever witness Franks not act with good judgment or fail to demonstrate initiative and drive. (Exhibit "II," p. 63).

Samuelson confirmed that during the time he worked with Franks, Franks suffered somewhere between twelve and eighteen or so diabetic incidents in the workplace. (Exhibit "II," p. 44).  Regarding said incidents, Samuelson testified, "It was a disruption to the office.  It was loud. . . People, co-workers were told to leave.  Co-workers were told to go home early if it was towards the end of the day.  It was a disruption to the work force." (Exhibit "II," p. 46-47).  Despite the fact that Franks had so many diabetic incidents at work, Samuelson testified that at no time did Franks' medical condition affect his ability to perform his job.  (Exhibit "II," p. 48).

**4.      Defendants Intention to Terminate Franks' Employment on the Basis that he was a Danger to Himself Because of his Disability, However, After Franks' Physician Failed to Corroborate their Suspicions, were Compelled to Terminate Franks on the Pretext of Unsatisfactory Work <u>Performance</u>.**

The summary judgment record demonstrates that the Defendants intended to terminate Franks' employment on the basis that he was a danger to himself and to others, because of his disability, however, after Franks' physician failed to corroborate their suspicions, they were compelled to terminate Franks on the pretext of Unsatisfactory work

performance.  As is evidenced by the record, Defendants required that Franks obtain certain

information from his physicians on a regular basis.  Every time that Franks was absent from

work due to his diabetes, Defendants prohibited him from returning to work unless he

presented a note from his physician indicating that he was in fact able to return.  The

requirement that Franks obtain said medical clearance was not a policy or procedure of the

County and was not required for any other employee, whether they suffered from a

disability or not.  Franks was singled out because the Defendants feared him, they feared

that he would harm himself, or even worse, someone else.  Defendants had no basis for this

presumption, merely a fear of the unknown.

Defendants admitted that they and other coworkers were scared when Franks

suffered a diabetic episode, as they referred to such incidents.  Defendants admitted that

they were unsure what to do for Franks when an incident occurred.  Defendants admitted

that they feared they could be held personally liable in the event they assisted Franks in an

improper manner by either giving him too much soda or not enough soda when needed, or

if they failed to contact the paramedics soon enough if needed.

In an effort to ease their fears and attempt to get Franks out of the workplace,

Defendants, on several occasions, insisted that Franks provide medical documentation

detailing his diabetic condition and requiring that his physician state that Franks was in fact

able to perform the essential functions of his job.  Franks' physician always promptly

replied to the Defendants' demands for information, and always stated that Franks was not

a danger to anyone.

Accordingly, as it became apparent that Defendants would not be able to obtain medical evidence that Franks was unable to perform his job or that he was a physical threat to himself or anyone else, Defendants embarked upon a campaign to terminate Franks for alleged unsatisfactory job performance. Suddenly, three "S"s, one "N," and one "U" rating warranted an overall Unsatisfactory rating whereas previously identical ratings added up to an overall Satisfactory rating. For accountants, their math clearly did not add up. Defendants continued to manipulate Franks' performance evaluations until they obtained the requisite number of Unsatisfactory evaluations to justify his termination. Franks posits that these performance reviews were tainted by Defendants and were cloaked in blatant disability discrimination. Thusly, the Court should deny Defendants' Motion for Summary Judgment.

**B.     The Court Should Deny the Defendants' Motion for Summary Judgment with Regard to the Individually Named Defendants in that they Aided and Abetted Unlawful Discrimination in Violation of the PHRA.**

The Court should deny the Defendants' Motion for Summary Judgment with regard to Defendants Kahler, Kehm, Klotz, Lazorik, Baker, and Nisbet in that their conduct was clearly violative of the PHRA. The PHRA prohibits "a person, employer, employment agency, labor organization, or employee, to aid, abet incite, compel or coerce the doing of an act declared . . . . to be an unlawful discriminatory practice." 43 Pa. Cons. Stat. Ann. §955(e). Based on the summary judgment facts as set forth at length herein above,

Defendants Kahler, Kehm, Klotz, Lazorik, Baker, and Nisbet all had supervisory authority over Franks, whether they evaluated his performance like Defendant Kahler, Kehm, Klotz, and Lazorik, received his complaints of discrmination like Baker, or instructed his supervisors to conduct surveillance and document his every move like Nisbet, such that they should be held liable for their unlawful and discriminatory actions under the PHRA. Ergo, the Court should deny the Defendants' Motion for Summary Judgment with regard to the individually named Defendants.

**V.    CONCLUSION:**

For the reasons set forth herein, Franks respectfully requests that the Defendants' Motion for Summary Judgment be denied.[1]

Respectfully submitted,

SIDNEY L. GOLD & ASSOCIATES, P.C.

_____
SIDNEY L. GOLD, ESQUIRE
Identification No.: 21374
TRACI M. GREENBERG, ESQUIRE
Identification No.: 86396
1835 Market Street - Suite 515
Philadelphia, PA 19103
(215) 569-1999
*Attorneys for Plaintiff*

_____

[1]  Upon reconsideration, Franks agrees to voluntarily withdraw his claim that Defendants failed to accommodate his disability.