# In The Matter Of:

*Franks v.*
*County of Lehigh, et al.*

*George M. Samuelson*
*November 18, 2002*

*V A R A L L O Incorporated*
*Registered Professional Reporters*
*1835 Market Street*
*Suite 600*
*Philadelphia, PA 19103*
*(215) 561-2220   FAX: (215) 561-2221*

*Original File GS111802.V1, 72 Pages*
*Min-U-Script® File ID: 2600039918*

**Word Index included with this Min-U-Script®**

Exhibit N

George M. Samuelson
November 18, 2002
Case 2:02-cv-02652-LP   Document 31-3   Filed 02/04/2004   Page 2 of 6
Franks v.
County of Lehigh, et al.

Page 12

**GEORGE M. SAMUELSON**

[2] A: Yes.
[3] Q: And as an accountant two, did you have an
[4] opportunity to interact with Mr. Franks?
[5] A: No.
[6] Q: So you would have obtained that position
[7] after Mr. Franks was separated from the county?
[8] A: Correct.
[9] Q: During your time in working with Mr. Franks,
[10] did you have an opportunity to get to know the
[11] quality of his work performance?
[12] A: Yeah, I reviewed his work. We worked
[13] together. I wasn't his supervisor. I didn't review
[14] him but I saw his work.
[15] Q: How did it come to be that you would see his
[16] work?
[17] A: Well, my title when I started was grants
[18] administrator. And Tim, I think, was an accountant
[19] two. My job when I was brought on was to pursue new
[20] funding. And Tim's was administering the grants
[21] that we currently had. And the way our supervisors
[22] had it setup, whatever Tim worked on came to me
[23] first for my review. Sometimes it went to the
[24] supervisors directly, of course. But I reviewed
[25] most grant reports before they were submitted

Page 13

**GEORGE M. SAMUELSON**

[2] externally to Harrisburg, or wherever else they
[3] would have gone.
[4] Q: Maybe you can educate me a little bit. When
[5] a county receives grants, I take it they are from
[6] the federal government?
[7] A: A lot of ours is state, maybe federal money
[8] coming through the state. Many of ours are
[9] Harrisburg. There are federal sources. There is
[10] even private foundations, local.
[11] Q: I take it one of the reasons you were hired
[12] was because you had some of that background in
[13] grants administration while you were at the
[14] Department of Education?
[15] A: Yes, I believe that's correct. I think they
[16] commented to such during the interview process that
[17] they wanted me to try to bring in outside dollars,
[18] from whatever source they may be, so they didn't
[19] have to use that many county dollars.
[20] Q: Are there grants available to counties if
[21] someone is somewhat knowledgable in terms of how to
[22] obtain them?
[23] A: Absolutely.
[24] Q: And just for example, these grants would be
[25] for education?

Page 14

**GEORGE M. SAMUELSON**

[2] A: We have many different. I work in a
[3] centralized fiscal office. So I help any office —
[4] as many offices that may have grants. We have a
[5] juvenile probation, we have district attorney, we
[6] have solid waste management. So whatever grants,
[7] not so much education, but maybe for hiring
[8] additional staff in their office, or some program
[9] their office may have been running.
[10] Q: These grants that are available here on the
[11] internet, I take it, or how do you learn they are
[12] available?
[13] A: List serves, web sites, Pennsylvania
[14] bulletins, federal register, you know, plenty of
[15] sources. We check daily and regularly.
[16] Q: So there are sources that you check in order
[17] to determine whether there are grants that might be
[18] available. And then in terms of eligibility, after
[19] making that determination, I guess then you would
[20] get someone's approval to apply for the grant?
[21] A: Correct. It was never, you know, my final
[22] say. They might ask me, give me an idea, this is
[23] what we are looking for, please go see what you can
[24] find. Or I might find something unsolicited and
[25] say, hey, here's what I found, how do you think

Page 15

**GEORGE M. SAMUELSON**

[2] about this. It was ultimately someone else's
[3] decision if a cash match was involved. Sometimes
[4] that did require adding personnel. That was not my
[5] call.
[6] Q: Who did you generally answer to, who was your
[7] immediate supervisor?
[8] A: There was two supervisory accountants when I
[9] started.
[10] Q: Who were they?
[11] A: Brian Kahler and Ted Kehm. And Thomas
[12] Lazorik was a fiscal officer. Those three
[13] supervisors are still —
[14] Q: Still there?
[15] A: Yes, but Brian and T.J. flipped titles.
[16] Q: If you found a grant that you thought might
[17] be suitable for what they were looking for, you
[18] would take it back to either Brian or Ted and say,
[19] here is what's available, should I apply for it or
[20] would you first apply for it and then —
[21] A: I wouldn't go to them right away. I might go
[22] to the person who asked me to find it. They are in
[23] more control of their budgets and what they are able
[24] to take on, and if there is a match involved where
[25] that match might come from.

Franks v.
County of Lehigh, et al.
Case 2:02-cv-02652-LP   Document 31-3   Filed 02/04/2004   Page 3 of 6
George M. Samuelson
November 18, 2002

Page 32

GEORGE M. SAMUELSON

[2] thought anything that may have been pointed out to
[3] him could have been fixed.
[4]     However, I was also privy to a lot of
[5] communications between Brian and Tim, I was cc'd
[6] on. Brian is a supervisor. Tim works for Brian.
[7] There were numerous e-mails back and forth.
[8]     Q: About what?
[9]     A: Suggest, fix your work in this way, dot, dot,
[10] dot, dot, dot.
[11]    Q: Was there anything in those e-mails that you
[12] read where Brian indicated any kind of
[13] dissatisfaction with the way Tim was preparing these
[14] spreadsheets?
[15]    A: I think these e-mails from Brian came about
[16] because he saw something in Tim's work that he
[17] didn't like. He wanted something cleaned up.
[18] That's my impression why he felt the need to send
[19] these e-mails. Clean up your work, let's submit it
[20] this way.
[21]    Q: Was there anything in those e-mails that you
[22] can recall that in your mind would have warranted
[23] termination?
[24]    A: I don't follow that question.
[25]    Q: I mean, was there something that was so

Page 33

GEORGE M. SAMUELSON

[2] egregiously wrong with regard to his designing these
[3] spreadsheets that would have said, hey, this guy
[4] doesn't know what he's doing or this guy is a slob,
[5] or this guy is way off the mark? There are routine
[6] errors that might occur with regard to people doing
[7] their work and there are certain errors that are so
[8] beyond out of bounds that people should be
[9] terminated. Would you agree with that proposition?
[10] You make some errors in your work, right?
[11]    A: Absolutely.
[12]    Q: You're not perfect, right?
[13]    A: No, I do.
[14]    MS. BLANCHARD: Wait for him to finish
[15] his question.
         BY MR. GOLD:
[17]    Q: Isn't it a fact that Mr. Franks trained you
[18] to some extent in what you do for the county to some
[19] extent?
[20]    A: Introduced me to the grants we had.
[21]    Q: I'm asking you when you saw those e-mails
[22] that came from Brian or Tom or Ted with regard to
[23] the spreadsheets, was there anything in those
[24] e-mails that you recall that made you stop and pause
[25] and say we have an incompetent person in our

Page 34

GEORGE M. SAMUELSON

[2] department?
[3]    A: I didn't — I didn't think like that. I
[4] thought Tim's work — I don't know why he was
[5] fired. So I didn't see anything in Tim's work.
[6]    Q: I'm telling you one of the reasons he was
[7] fired is because they claim he wasn't neat with
[8] regard to his work papers and they weren't legible.
[9] Okay, that's one of the reasons. The other reason
[10] they give is he didn't properly design these Excel
[11] spreadsheets. And he didn't provide proper
[12] documentation in terms of the progression of events
[13] in terms of these grants. These are the reasons
[14] that we were given.
[15]    I'm asking you, do you recall anything
[16] in any e-mails that you read that were either
[17] generated by Brian, Ted or Tom with regard to those
[18] issues that in your mind would have warranted
[19] termination?
[20]    A: I don't remember seeing anything in the
[21] e-mails that I thought was major enough that
[22] couldn't be fixed, that if it wasn't fixed it would
[23] result in Tim's firing. However, I don't know how
[24] many — those e-mails came on numerous occasions. I
[25] can't say Tim addressed everything that was asked of

Page 35

GEORGE M. SAMUELSON

[2] him, or if he did, he ran it back through me so I
[3] could concur.
[4]    Q: I understand that. You may have been out of
[5] the loop on some of these things, but when you were
[6] in the loop you stand by your answer?
[7]    A: Correct, I do.
[8]    Q: Okay. Now, one of the other reasons that we
[9] articulated for Mr. Frank's termination is he didn't
[10] explain and report on ongoing grant projects. Were
[11] you aware of that deficiency in Mr. Franks' work
[12] performance at the time of his termination?
[13]    A: Report ongoing grant activity?
[14]    Q: Report on ongoing grant projects, whatever
[15] that means?
[16]    A: I wasn't aware of that.
[17]    Q: Did anyone ever come to you and say, you
[18] know, we can't get any reports from Tim Franks on
[19] these ongoing grant projects, do you know what in
[20] the hell he's doing or can you enlighten us on where
[21] he is on these ongoing grant projects?
[22]    A: No. We were all in the same office. Tim and
[23] I kind of sat kitty-corner.
[24]    Q: Another reason he was given for termination
[25] is that he didn't retain knowledge of the county

Page 48
**GEORGE M. SAMUELSON**

[2] eaten something, you know, if I thought him and I
[3] were talking in an incoherent conversation.
[4]   Q: He would become somewhat incoherent if his
[5] Insulin level was low or his blood sugar rate was
[6] too high or too low?
[7]   A: Correct. There was usually some outward sign
[8] that I could tell, if I happened to be working with
[9] him at the time.
[10]   Q: Do you know, aside from the times when he had
[11] to be taken away or had a seizure, did his diabetic
[12] condition ever interfere with his work performance
[13] to the best of your knowledge?
[14]   A: Can you repeat the question?
[15]   Q: Yeah. Aside from the instances when he had
[16] to be taken out by paramedics or had a seizure on
[17] the job, did his diabetic condition in any any
[18] interfere with his ability to do his job, his work
[19] performance?
[20]   A: Nothing that I saw, other than the
[21] disruptions it caused when they happened.
[22]   Q: Was there a reaction to these seizures? I
[23] mean, were people generally concerned, were they
[24] frightened?
[25]   A: I think those are accurate.

Page 49
**GEORGE M. SAMUELSON**

[2]   Q: Okay. Would Mr. Franks be on the floor,
[3] would he be shaking? You said there was noise, are
[4] we talking noise from Mr. Franks? Are we talking
[5] noise from having perhaps fallen onto the floor?
[6]   A: Noise would come from — on occasion Tim
[7] might shout out my name, what's going on here. The
[8] noise I'm thinking of is all the traffic it caused
[9] coming into the office, the paramedics with their
[10] walkie-talkies. A lot of voices. I don't think I
[11] ever saw Tim on the floor, usually on a stretcher.
[12]   Q: When he would have a seizure, would he be
[13] actually seated at his desk with his head over the
[14] desk, or would he fall off his chair?
[15]   A: I don't recall seizures so much as I think I
[16] could tell when Tim was standing up in his cubical
[17] looking around —
[18]   Q: Disoriented?
[19]   A: — aimlessly, correct.
[20]   Q: Have you ever seen anybody with an epileptic
[21] seizure?
[22]   A: Yes.
[23]   Q: Would you say they were comparable to what
[24] Tim was experiencing by way of a diabetic seizure or
[25] were they different?

Page 50
**GEORGE M. SAMUELSON**

[2]   A: I don't think I ever saw Tim having what I
[3] remember to be an epileptic seizure.
[4]   Q: So what you recall observing was some
[5] disorientation, and clearly it was enough for you to
[6] realize that Tim was having some problem with either
[7] his Insulin level or blood sugar levels?
[8]   A: Correct.
[9]   Q: Do you recall there being any issue with
[10] regard to Tim's tardiness or observing work starting
[11] hours?
[12]   A: I recall Tim coming in close to the bell,
[13] eight o'clock on many occasions.
[14]   Q: Okay. Did anyone ever come to you, meaning
[15] either Ted, Tom or Brian saying, hey, you know, Tim,
[16] we have a problem with Tim because of his
[17] tardiness? Did you have any conversations with
[18] anyone about that?
[19]   A: No.
[20]   Q: Do you have any personal recollection as to
[21] whether Tim's ability to show up to work on time was
[22] actually a serious problem, or was it kind of a
[23] routine issue?
[24]   A: I saw it happen on many occasions. What you
[25] described a serious issue versus common occurrence,

Page 51
**GEORGE M. SAMUELSON**

[2] to me — it was a serious issue for our supervisors
[3] if it happened frequently.
[4]   Q: Do you recall that being an issue before Mr.
[5] Franks was terminated, his tardiness?
[6]   A: I recall in that I could see when Tim came
[7] into the office sometimes. I was never — e-mails
[8] could be sent directly from supervisors to the
[9] individual if they were late. I was never called
[10] into those conversations.
[11]   Q: If a person comes in late, two minutes, three
[12] minutes late, and either makes it up during
[13] lunchtime or stays later beyond closing, have you
[14] ever heard of that as being a way to resolve that
[15] issue?
[16]   A: Not in the fiscal office. I've seen that
[17] flexibility elsewhere.
[18]   Q: Do you personally recall any reason that was
[19] ever given by Mr. Franks in terms of why he was
[20] late?
[21]   A: No.
[22]   Q: You don't know whether Mr. Franks actually
[23] communicated to his supervisors as to why he was
[24] late, for instance, he may have been having problems
[25] regulating his blood level?

Franks v.
County of Lehigh, et al.
Case 2:02-cv-02652-LP    Document 31-3    Filed 02/04/2004    Page 5 of 6
George M. Samuelson
November 18, 200[?]

Page 56

[1]             **GEORGE M. SAMUELSON**
[2] define excellent and satisfactory.
[3]    THE WITNESS: My characterization would
[4] be satisfactory.
[5]             BY MR. GOLD:
[6]    Q: How about the quantity of work that was
[7] actually generated by Mr. Franks; satisfactory,
[8] excellent, or unsatisfactory, or satisfactory?
[9]    A: Satisfactory.
[10]    Q: How about his work habits?
[11]    A: Can you define work habits?
[12]    Q: I would imagine, you know, whatever work
[13] habits are, you come to work, you do your work, or
[14] you come to work and daydream, or you are a
[15] procrastinator. My daughter has poor work habits.
[16] I don't want to get into quantifying them. It
[17] depends on how you judge things.
[18]    A: Based on what you said I would say
[19] satisfactory.
[20]    Q: His work attitude?
[21]    A: Can you define that?
[22]    Q: Comes into work, is piss'd off about having
[23] to do work, or exhibits a negative attitude with
[24] regard to the office?
[25]    A: I would say satisfactory.

Page 57

[1]             **GEORGE M. SAMUELSON**
[2]    Q: Relationship with other workers?
[3]    A: Professionally, satisfactory.
[4]    Q: Personal qualities, whatever that is?
[5]    A: What is that?
[6]    Q: I have no idea. I mean, that's one of the
[7] things he was ranked on. It said here he must
[8] improve because of, I guess, his personal
[9] qualities. There was some issue with regard to Mr.
[10] Franks, there was once a birthday party in the
[11] office and someone said that Mr. Franks had some of
[12] the icing off the cake. Do you recall that?
[13]    A: I recall the conversation. I don't recall
[14] witnessing that.
[15]    Q: There was something about he would bring a
[16] bottle of water to work and it would drip from the
[17] water cooler to his desk, and that was one of the
[18] issue they raised at the termination hearing. Do
[19] you recall that being an issue?
[20]    A: I don't recall that issue.
[21]    Q: I have no idea what they are talking about
[22] then. You are rated on these things?
[23]    A: Right. I recall the one incident you talked
[24] about. If you are asking me what my review of his
[25] personal qualities —

Page 58

[1]             **GEORGE M. SAMUELSON**
[2]    Q: Yeah, maybe it goes to dress. I don't know
[3] what it goes to.
[4]    A: I would say satisfactory between me and Tim.
[5]    Q: How about yourself, were you ever rated on
[6] your personal qualities?
[7]    A: I have the same review page.
[8]    Q: When they rate you what do you think it
[9] means?
[10]    A: Personal qualities?
[11]    Q: Yeah.
[12]    A: My guess, it's been a while since the review
[13] now; appearance, personal — how you get along well
[14] with others.
[15]    MS. BLANCHARD: Is that your guess or one
[16] of your supervisors told you that, that that's what
[17] personal qualities are?
[18]    THE WITNESS: No. That's my guess what
[19] personal qualities mean.
[20]             BY MR. GOLD:
[21]    Q: Have you ever been told what are the
[22] objective criteria that are used to determine what
[23] one's work habits are when doing an evaluation?
[24] Let's say yourself, I take it you receive all
[25] excellents on your performance reviews?

Page 59

[1]             **GEORGE M. SAMUELSON**
[2]    A: No.
[3]    Q: Do you get satisfactories or above
[4] satisfactory?
[5]    A: Yes.
[6]    Q: So let's assume that you are given — what
[7] was your last review for work habits?
[8]    A: I don't recall.
[9]    Q: Okay. Well, were you ever told what the
[10] objective criteria are that are used as a basis for
[11] determining one's work habit? I mean, do you have
[12] to get 15 pieces of paper off your desk, do you have
[13] to show up to work smiling? What is the criteria,
[14] if you know?
[15]    A: I never asked because my reviews were never
[16] an issue.
[17]    Q: How about work attitude, did anyone ever tell
[18] you that we are going to judge your work attitude
[19] based on, you know, whether you are depressed or
[20] whether you are happy, or whether you take on
[21] additional work? I mean, do you know what the
[22] criteria is for work attitude?
[23]    A: No one ever asked me. I don't know what the
[24] criteria are.
[25]    Q: Were you ever told what the criteria was for

Page 60

GEORGE M. SAMUELSON

[2] quantity of work done? Were you ever given a quota
[3] in terms of — or objectives in terms of what you
[4] had to do?
[5]  A: I was not told, nor was I given quotas.
[6]  Q: You don't know what the standard is for
[7] quantity of work, correct?
[8]  A: I've never asked. I've received them and
[9] left.
[10]  Q: Again, he was greater than satisfactory in
[11] that category. How about quality of work? Has
[12] anyone ever told you what the criteria was for
[13] quality of work?
[14]  A: Quality of work, no one has told me. I could
[15] guess what it means.
[16]  Q: Okay. What is it?
[17]  A: Quality to me means cleanliness, neatness,
[18] promptness, if you have deadlines to meet, that sort
[19] of thing.
[20]  Q: When you turn a piece of work in, let's
[21] assume that it's an application for a grant?
[22]  A: Correct.
[23]  Q: Does somebody grade that when you turn it
[24] in? Does somebody say this doesn't meet our
[25] standards of quality?

Page 61

GEORGE M. SAMUELSON

[2]  A: I don't know what goes. My bosses review
[3] what I send out.
[4]  Q: Are you given a written comment on each and
[5] every grant application that you make?
[6]  A: No.
[7]  Q: Does anyone ever come to you and say your
[8] work attitude was inappropriate for this particular
[9] grant or your personal qualities are lacking with
[10] regard to this particular grant?
[11]  A: I have not been told that.
[12]  Q: Has anyone ever come up to you and criticized
[13] your work attitude?
[14]  A: Not that I know of.
[15]  Q: Do you have any idea why it wasn't rated
[16] excellent?
[17]  A: Mine may have been.
[18]  Q: How about your personal qualities? Anyone
[19] come up to you and say, you know, you are a slob or
[20] your tie doesn't match your sport jacket, therefore,
[21] you've got to improve the personal quality of your
[22] work? I mean, have you ever been told there is an
[23] issue with regard to your personal qualities?
[24]  A: I have never been told there was an issue.
[25]  Q: Were you given an excellent rating on that?

Page 62

GEORGE M. SAMUELSON

[2]  A: I have been.
[3]  Q: Supervisory ability, Mr. Franks was not rated
[4] on that because he didn't supervise anybody.
[5]  How about it says additional factors,
[6] list and identify. That was satisfactory. Overall
[7] work performance, if you had to grade Mr. Franks'
[8] overall work performance as either satisfactory or
[9] unsatisfactory or excellent, where would you place
[10] him by your own personal standards?
[11]  A: I would say satisfactory.
[12]  Q: Okay. You became an accountant two after Mr.
[13] Franks was let go, correct?
[14]  A: Yes, after he was let go.
[15]  Q: And have there been occasions when you've had
[16] to call Mr. Franks for some assistance in doing your
[17] present job?
[18]  A: No, not that I can remember.
[19]  Q: Okay. Were there times when you worked with
[20] Mr. Franks that he did assist you when you first
[21] came on board, any recollection of that?
[22]  A: Not so much with my job because our jobs were
[23] different. Assisted in learning the fiscal office
[24] and the grants that we had, yes.
[25]  Q: He trained you to some extent with regard to

Page 63

GEORGE M. SAMUELSON

[2] that?
[3]  A: He introduced me to the grants that he was
[4] working on.
[5]  Q: Okay. So you found him to be cooperative to
[6] that extent?
[7]  A: Yes.
[8]  Q: Did you find that Mr. Franks exhibited an
[9] attitude that somehow hurt office morale or didn't
[10] hurt the department morale?
[11]  A: I didn't see any exhibition.
[12]  Q: Are you supervising anyone today?
[13]  A: Nope.
[14]  Q: Okay. I think I now know what makes up
[15] personal qualities because I've just got the sheet
[16] here. Let me take you through them. Did you ever
[17] witness Mr. Franks not act with good judgment?
[18]  A: Not act with good judgment?
[19]  Q: Yeah.
[20]  A: I don't recall. Not that I recall, no.
[21]  Q: Did you ever witness Mr. Franks not
[22] demonstrate initiative and drive?
[23]  A: Did I ever see him not demonstrate initiative
[24] and drive, not that I recall.
[25]  Q: Did you ever see him not to be adaptable to

Page 60 - Page 63 (18)   Min-U-Script®   Vincent Varallo Associates, Inc.

Exhibit N